Ronald and Jeanna KINNICK, Glenn and Candy Czaikowski, Ruth Lish; Lucille Stodola, Art and Ethel Gregg, Duane Hamm, Eugene and Diane Hollar, and Marvin, Barb and Amy Lynn Krayecki, Plaintiffs,

v.

SCHIERL, INC., f/k/a Schierl Oil and Heating, Inc., Defendant-Third Party Defendant-Co-Appellant,

WISCONSIN CENTRAL, LTD., Defendant-Third Party Plaintiff-Appellant,

David SEIDL, d/b/a East Side Service, a/k/a East Side Auto, David Draxler, d/b/a East Side Auto, Defendants,

MINNEAPOLIS, ST. PAUL AND SAULT STE. MARIE RAILWAY CO., Defendant-Third Party Plaintiff-Appellant,

RURAL MUTUAL INSURANCE COMPANY, Defendant,

GRINNELL MUTUAL REINSURANCE COMPANY, Integrity Mutual Insurance Company, Defendants-Respondents,

SENTRY INSURANCE, a mutual company, and General Casualty Company of Wisconsin, Defendants,

David SEIDL, d/b/a East Side Service, a/k/a East Side Auto, Third Party Plaintiff-Respondent,

Dave DRAXLER, d/b/a East Side Auto of Milladore, Third Party Defendant-Appellant,

SENTRY INSURANCE, a mutual company, Third Party Plaintiff,

855

Hughes Service, Inc., ABC Insurance Company, Charles Kramer, Rural Mutual Insurance Company, a Wisconsin mutual insurance company, John Le Savage, DEF Insurance Company, Brian Heeg, d/b/a Heeg Drilling, GHI Insurance Company, Rudolph Ullman, JKL Insurance Company, Ronald Brock d/b/a Brock Implement, MNO Insurance Company, David Willfahrt; Willfahrt Trucking, Inc., PQR Insurance Company, and General Casualty Company of Wisconsin, a Wisconsin insurance corporation, Joseph Malik f/d/b/a Milladore Oil Company, Leonard Hartl, f/d/b/a Auburndale Oil Company, Anthony Lobner, Michael Clark, Glen Seidl, d/b/a Eastside Service, a/k/a Eastside Auto, and General Casualty Insurance Company, Third Party Defendants,

Fred BAILEY, Third Party Defendant-Respondent. [Case No. 93-1784]

Ronald and Jeanna KINNICK, Glenn and Candy Czaikowski, Ruth Lish; Lucille Stodola, Art and Ethel Gregg, Duane Hamm, Eugene and Diane Hollar, and Marvin, Barb and Amy Lynn Krayecki, Plaintiffs,

v.

SCHIERL, INC., f/k/a Schierl Oil and Heating, Inc., Defendant-Third Party Defendant-Appellant,

WISCONSIN CENTRAL, LTD., Defendant-Third Party Plaintiff-Co-Appellant,

David SEIDL, d/b/a East Side Service, a/k/a East Side Auto, David Draxler, d/b/a East Side Auto, Defendants,

MINNEAPOLIS, ST. PAUL AND SAULT STE. MARIE RAILWAY CO., Defendant-Third Party Plaintiff-Co-Appellant,

856

RURAL MUTUAL INSURANCE COMPANY, Defendant,

GRINNELL MUTUAL REINSURANCE COMPANY, Defendant-Respondent,

INTEGRITY MUTUAL INSURANCE COMPANY, Sentry Insurance, a mutual company, and General Casualty Company of Wisconsin, Defendants,

David SEIDL, d/b/a East Side Service a/k/a East Side Auto, Sentry Insurance, a mutual company, Third Party Plaintiffs,

HUGHES SERVICE, INC., ABC Insurance Company, Charles Kramer, Rural Mutual Insurance Company, a Wisconsin mutual insurance company, John Le Savage, DEF Insurance Company, Brian Heeg, d/b/a Heeg Drilling, GHI Insurance Company, Rudolph Ullman, JKL Insurance Company, Ronald Brock, d/b/a Brock Implement, MNO Insurance Company, David Willfahrt; Willfahrt Trucking, Inc., PQR Insurance Company, and General Casualty Company of Wisconsin, a Wisconsin insurance corporation, Joseph Malik f/d/b/a Milladore Oil Company, Leonard Hartl, f/d/b/a Auburndale Oil Company, Anthony Lobner, Michael Clark, Glen Seidl, d/b/a Eastside Service, a/k/a Eastside Auto, General Casualty Insurance Company, and Fred Bailey, Third Party Defendants.
[Case No. 93-2727]

Court of Appeals

■■■■■■■ *Submitted on briefs August 11, 1994.—Decided October 26, 1995.*

(Also reported in 541 N.W.2d 803.)

For the defendant-third party plaintiff-appellant, Wisconsin Central, Ltd. and Minneapolis, St. Paul and Sault Ste. Marie Railway Co., the cause was submitted on the brief of *Jake M. Holdreith* of *Oppenheimer, Wolff & Donnelly* of St. Paul, MN., and for the defendant-third party defendant-co-appellant, Schierl, Inc. f/k/a Schierl Oil and Heating, Inc., the cause was submitted on the brief of *Winston A. Ostrow* of *Godfrey & Kahn, S.C.* of Green Bay, WI.

For the third party defendant-appellant, David Draxler d/b/a East Side Auto of Milladore, the cause was submitted on the brief of *Leon S. Schmidt, Jr.* of *Schmidt, Thibodeau & Grace* of Wisconsin Rapids, WI.

For the third party plaintiff-respondent, David Seidl d/b/a East Side Service a/k/a East Side Auto, the cause was submitted on the brief of *George A. Richards* and *Paul E. David* of *Patterson, Richards, Hessert, Wendorff & Ellison* of Wausau, WI.

Before Eich, C.J., Gartzke, P.J., and Sundby, J.

GARTZKE, P.J.  Schierl, Inc., Wisconsin Central, Ltd., and Sault Ste. Marie Railway Co. appeal from a summary judgment dismissing their cross-claims against David Seidl. Plaintiffs Ronald and Jeanna Kinnick and others brought the underlying action, alleging that the appellants are responsible for contaminants in the water wells on the plaintiffs' properties. Appellants cross-claimed against Seidl for contribution, alleging that he is also responsible for the contaminants. We affirm the judgment.

The questions are: (1) whether factual issues exist which must be tried, (2) whether the undisputed evidence is such that expert testimony is necessary to establish a causal link between the contaminants in the plaintiffs' wells and the contamination found on Seidl's property, (3) whether the trial court prematurely granted summary judgment to Seidl, and (4) whether, in any event, the court erred by dismissing the cross claims with prejudice. We conclude that because of appellants' inability to establish by expert testimony that contamination from Seidl's property contributed to the contamination in the plaintiffs' wells, the court properly granted summary judgment

dismissing the cross claims and did not act prematurely. We affirm the judgment, without deciding whether the court erred when dismissing the cross claims with prejudice.

It is undisputed that the plaintiffs' properties are contaminated with the same kind of contaminants found on the properties of the appellants and Seidl's property, and that the contamination occurred via underground routes. If contaminants migrated from Seidl's property and from the appellants' properties to the plaintiffs' properties, then appellants may be entitled to contribution from Seidl.

Seidl moved for summary judgment on grounds that whether contaminants migrated from his property to the plaintiffs' is a factual issue requiring special knowledge, skill and experience outside the realm of the ordinary experience of mankind, especially where there are various potential sources of the contamination. He asserted that the testimony of an expert witness, qualified to render an opinion regarding his property as the source of the contaminants in the plaintiffs' wells, is necessary for the appellants to have contribution from him.

The trial court granted summary judgment to Seidl dismissing the appellants' cross claims after finding that no party to the litigation has an expert witness who will testify to a reasonable degree of probability, or even to a likelihood, that contaminants migrated from Seidl's property to the plaintiffs' properties.

Appellants assert that undisputed expert testimony showed that "possible" routes exist for the contaminants to have migrated from Seidl's property to the plaintiffs' properties. They rely on the undisputed facts that plaintiffs' properties are contaminated with the same kinds of contaminants found on Seidl's prop-

erty and the appellants' properties. They argue that, drawing every inference in favor of the appellant co-defendants, a genuine dispute as to material facts exist and therefore summary judgment should not have been granted. We disagree.

We consider the necessity for expert testimony without deference to the trial court's opinion. *See Cramer v. Theda Clark Memorial Hospital*, 45 Wis. 2d 147, 150-53, 172 N.W.2d 427, 428-30 (1969). However, appellants concede in their joint brief that the migration of contaminated groundwater is an extremely complicated, technical matter, and ascertainment of it requires considerable expertise, along with extensive and expensive site investigation. This concession is enough to establish that expert testimony is required to prove that contaminants migrated from Seidl's property to the appellants' properties.

At trial the burden of proving that the described migration has occurred, for purposes of obtaining contribution, will be on the appellants. When expert testimony is required and is lacking, the evidence is insufficient to support a claim. *Cramer*, 45 Wis. 2d at 152, 172 N.W.2d at 429. Because appellants lack the necessary expert testimony, we conclude that no factual issues remain to be tried, and Seidl is entitled to summary judgment dismissing their cross claims.

Appellants nevertheless assert that because experts believe that the Seidl property is a "possible" source of the contamination to the plaintiffs' properties, and because when Seidl's motion was made they were seeking additional investigation to ascertain the contamination routes, the trial court prematurely granted summary judgment to Seidl. We disagree.

"[A]n expert opinion expressed in terms of possibility" is insufficient and is inadmissible in evidence. *McGarrity v. Welch Plumbing Co.*, 104 Wis. 2d 414, 430, 312 N.W.2d 37, 45 (1981).

Appellants assert that the court's ruling denied them fair opportunity to develop their case, because when Seidl's motion was heard, the trial date was seven months away, discovery cutoff was six months away, and they had asked the trial court to enter a *"Lone Pine* order." The term *"Lone Pine* order" originated in *Lore v. Lone Pine Corp.*, a New Jersey toxic tort case against a landfill operator and the generators and haulers of toxic materials to the landfill.[1] In a case management order, the *Lone Pine* trial court directed the plaintiffs to provide, within four months, expert opinions supporting their personal injury and property damage claims, including opinions regarding

---

[1] D. Alan Rudin, *Strategies in Litigating Multiple Plaintiff Toxic Tort Suits, in* ENVIRONMENTAL LITIGATION 122, 137-42 (Janet S. Kole et. al. eds. 1991). Rudin states that *Lone Pine* orders are useful to achieve efficiency and economy in toxic tort cases. Because numerous plaintiffs are usually involved, discovery is difficult to control, and a case management order (CMO) can regulate the process. A CMO can avoid duplication of effort by allowing common issues and claims to be identified and addressed *en masse*. Because of the unknown properties of certain chemicals, the individualized nature of each plaintiff's medical and social history, and the long latency period of certain ailments, establishing a causal relationship between an injury and chemical exposure is often difficult. A *Lone Pine* CMO forces plaintiffs to substantiate exposure, injury and causation. Rudin concludes that these are some of the reasons why CMOs play an increasing role in toxic tort litigation. *Id.* at 141-42. Appellants do not discuss the advantages of a *Lone Pine* CMO, except to argue that the trial court should have ordered one to benefit them.

causation by substances from the landfill. *Id*. at 137-38. When the plaintiffs did not comply with the order, the court dismissed their cases with prejudice.

A *Lone Pine* order is not a condition precedent to summary judgment dismissing a toxic tort case. Whether to impose the order is within the trial court's discretion. The trial court said that after considering such an order, it could not enter it and be fair to Seidl and other parties who moved for summary judgment.

The record supports the trial court's ruling. As the order granting summary judgment recites, this action was commenced on November 6, 1991. The court had set numerous scheduling conferences and scheduling orders since then. The plaintiffs named their expert witnesses in 1992 and the appellants named their expert witnesses on March 1, 1993. By May 3, 1993, when the trial court heard and granted Seidl's motion for summary judgment, all parties acknowledged that no party had an expert witness who would testify to a reasonable degree of probability that contaminants from Seidl's property reached the properties of the plaintiffs.

We understand the trial court to have reasoned that after so much time and effort had elapsed, whether the appellants could obtain expert opinion favorable to them was "pure speculation," and the court was "afraid [what] a Lone Pine order is going to do to the entire schedule." When asked to reconsider its order to dismiss the cross claims with prejudice, the court expressed concern that Seidl (and others who had

moved for summary judgment) "are expending a great deal of money over a great period of time."[2]

We conclude the trial court did not erroneously exercise its discretion when it declined to enter a *Lone Pine* order granting the defendants additional time.

Co-defendants assert that § 802.08(4), STATS., mandates a *Lone Pine*-type order, under the circumstances presented in this case. We disagree. Section 802.08(4) provides in substance that if the party opposing a motion for summary judgment shows that the party cannot present facts essential to justify the party's opposition, the court may refuse to grant the motion or may order a continuance to permit affidavits to be obtained or depositions taken or discovery to be had or make such other further order as is just. Thus, whether to refuse a motion for summary judgment in order to give an opposing party additional time to obtain essential facts to defeat summary judgment is a highly discretionary ruling. We have already concluded the trial court did not erroneously exercise its discretion in declining to enter a *Lone Pine* order.

Finally, appellants assert that when it ordered dismissal of the cross claims with prejudice, the trial court unfairly precluded their bringing a future contribution claim against Seidl. Appellants treat the issue as one involving the exercise of discretion, but without briefing the appropriate scope of review.[3] The parties cite

---

[2] As of the date of the hearing, Seidl had incurred investigation expenses amounting to $38,466.17 and legal expenses amounting to about $63,500.

[3] *Compare Potts v. Farmers Mut. Automobile Ins. Co.*, 233 Wis. 313, 318, 289 N.W. 606, 609 (1940) (trial court apparently

no authority which prevents a trial court from dismissing a complaint with prejudice on summary judgment. We decline to review an issue inadequately briefed. *State v. Pettit*, 171 Wis. 2d 627, 647, 492 N.W.2d 633, 642 (Ct. App. 1992).

*By the Court.*—Judgment affirmed.

SUNDBY, J. (*dissenting*). Our decision herein will have a profound effect upon trial practice. No longer will counsel be able to rely·on a scheduling order to prepare for trial.

Under the scheduling order in this case, plaintiffs had six months to complete discovery and trial was not scheduled for seven months when defendant and third-party plaintiff David Seidl moved for summary judgment. Nonetheless, the trial court granted Seidl's motion because plaintiffs' expert witness was not prepared at that time to express an opinion to a hydrogeologic probability that contaminants from Seidl's property were a source of contamination of plaintiffs' wells. I conclude that plaintiffs' proof satisfied the requirement of § 802.08(4), STATS.[1] They show by affidavit cause for their inability to present facts

erred as a matter of law when it granted summary judgment dismissing a complaint without prejudice), with *Pattermann v. Whitewater*, 32 Wis. 2d 350, 360-61, 145 N.W.2d 705, 710 (1966) (summary judgment dismissing complaint should have been without prejudice, to allow plaintiff to file claim against city under § 62.25, STATS., 1963, where document previously filed was only a notice of injury and not a claim).

[1] Section 802.08(4), STATS., provides:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the motion for judgment or may order a continuation to

essential to justify their opposition to Seidl's motion. Upon that showing and their showing that they could likely present such facts after further investigation and discovery, the trial court should have denied Seidl's motion and allowed plaintiffs to complete discovery.

It is undisputed that plaintiffs' and Seidl's wells contain the same contaminant, petroleum. A gasoline station was operated on Seidl's property for sixty-three years. Seidl's only defense is that the contaminants from his wells did not migrate to plaintiffs' wells. Plaintiffs' expert witness testified that migration from Seidl's wells to plaintiffs' might be established through on-going investigation. The trial court concluded that that was not a sufficient showing. It did not consider that plaintiffs had six months under the scheduling order to complete discovery.

Plaintiffs began this action November 6, 1991, alleging that they were owners of property whose wells were being contaminated by seepage from a gasoline and bulk fuel station and Seidl's gas station known as East Side Auto. At the time plaintiffs submitted their brief to this court, both properties were owned by Wisconsin Central Ltd. and were formerly owned by the Soo Line Railroad.

East Side Auto had been operated as a retail gasoline facility for over sixty-three years. In November 1990, Central Wisconsin Engineers, Inc. (CWE) removed three underground storage tanks at David

permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

The statute is identical to Rule 56(f), Federal Rules of Civil Procedure, and was adopted when the supreme court "federalized" Wisconsin's rules of civil procedure, 67 Wis. 2d 587, 630-32 (1976).

867

Seidl's request. Because of the obvious contamination CWE discovered, the excavated soils were backfilled, to be addressed in the remedial phase of the project. Several months prior to the tank removal, numerous private wells in the vicinity were determined to contain petroleum-related contaminants. During this time, two other sites in the area were investigated to determine whether petroleum contaminants from their property were migrating to the private wells.

After a public hearing, DNR issued orders to several potential responsible parties (PRPs), including East Side Auto. CWE reported: "To date, the extent and degree of the groundwater contamination in the Milladore area has not been determined, but is believed to be following possible fracture patterns in the bedrock layer. Because the extent of the groundwater contaminant plume is not known, no remedial activities have yet been implemented."

Because the trial court relied to some extent on the time plaintiffs had had for discovery, it is significant to demonstrate that the investigation of groundwater pollution, to locate the source of the pollution, to conduct negotiations with and hold hearings before DNR, and to prepare and carry out a remediation plan is a very lengthy process. After CWE removed the underground storage tanks in November 1990, CWE presented to DNR its "Tank Closure Site Assessment for East Side Auto" February 1991. Field activities for the investigation by CWE took place August 5-12, 1992. CWE shows the scope of the work which it performed in para. 1.3 of its report. It did not complete its report until March 1993.

While CWE was making its investigation for East Side Auto, two other sites were under investigation by DNR. Between March 5, 1990, and May 6, 1992, DNR

tested approximately forty-one sites for the presence of VOCs, and identified approximately eleven sites having exceedances of several petroleum product contaminants.

CWE identified that regional and local groundwater flow was to the south-southeast. It also calculated the flow velocity of ground water at the East Side Auto site as approximately 7.5 feet per year. CWE identified potential migration pathways from the site, including a sewer lateral and bedrock fractures. CWE also identified potential receptors of contamination. In para. 3.6 of its report, it stated:

> Because the groundwater within the bedrock layer has been determined to contain exceedances of petroleum compounds, and based on the increase of the number of contaminated wells and increase in contaminant levels, it is likely that the contaminant plume will continue to migrate. Possible fracture patterns within the bedrock layer may pose a threat to the deeper aquifer, particularly because groundwater will tend to follow fracture patterns. Therefore, nearby/neighboring wells down gradient and side gradient from East Side Auto . . . may be potential receptors for future or increased contamination. . . .

DNR and Seidl and the two other PRPs stipulated with DNR in four proceedings—NCD-91-12, NCD-91-13, NCD-91-14, and NCD-91-15—to further activity relative to the discharges of hazardous substances from the three sites. The stipulation was entered into March 23, 1993. Included was submission of the Remedial Investigation/Feasibility Study Report, including a proposed final remedial action plan (RAP), implementation of the RAP, completion of the RAP, and submission of the RAP report. In addition, the PRPs

agreed to either: (a) "have CWE resubmit its October 1992 Investigation Report, incorporating DNR's comments of November 10, 1992"; or (b) "have the new consultant prepare a report, in accordance with DNR's Remedial Investigation Checklist . . . ." DNR and East Side Auto further stipulated that the time limits as to East Side Auto were subject to East Side Auto obtaining financing to complete the project.

Plaintiffs named Robert J. Karnawskas their expert witness. Seidl took Karnawskas's deposition February 9, 1993. He deposed that there was basic information on the groundwater flow patterns in the area of East Side Auto that needed confirmation before he could give an opinion with a reasonable degree of hydrogeologic certainty. When asked whether that flow pattern had been determined "as of this time," Karnawskas testified:

> I believe given the contaminant levels that have been observed on the Schierl property, that there is a reasonable degree of certainty as to a . . . relationship between that contamination and that which is observed at the Ruth Lish property. *And until further work is done*, it's possible also that the contamination emanating from the East Side Auto property may also have involvement.

(Emphasis added.)

In response to a question as to sites possibly being reached by contaminants originating at the East Side Auto site, he testified:

> I think further evaluations done on the nature of fractures and patterns that exist in that area, that would enable one to . . . formulate a more conclusive opinion [as] to what extent those fractures

may play a role in the contaminants migrating from that far east toward the west of those wells.

He further deposed that it was "possible" that contaminants from the East Side Auto site could be the source of contaminants found in neighboring wells.

Winston A. Ostrow, an attorney for defendant Schierl, Inc., deposed that as of April 1, 1993, Schierl was obtaining work plans from environmental consultants to complete the environmental investigation of the Milladore area, including investigation of the potential contamination pathways discussed in CWE's report. He further deposed that this investigation was subject to the strict time schedule imposed in the stipulation with DNR.

From this evidence, particularly the report of CWE, I conclude that expert testimony was not necessary to permit a jury to conclude that it was probable that East Side Auto was a source of the contaminants in the wells of the nearby properties. The fact that the contaminants in East Side Auto's wells and the neighboring wells were identical alone would sustain a jury's verdict that East Side Auto was a source of the contamination of the adjacent wells.

However, if expert testimony is necessary, the trial court's grant of summary judgment was premature when six months remained for discovery under the scheduling order and seven months remained before trial.

A scheduling order is in the nature of a stipulation between the parties and the court as to the conduct of discovery and trial.

> One of the primary goals of the rules [of civil procedure] is to establish a system in which lawyers and litigants may confidently expect their cases to move

871

along apace. *The scheduling order is intended to provide the framework in which lawyers can realistically allocate time to the pretrial activities in each case. Since modifications of the scheduling order necessarily lessens the scheduling certainty that is the goal of this rule, they should be granted sparingly.*

Charles D. Clausen & David P. Lowe, *The New Wisconsin Rules of Civil Procedure: Chapters 801-803*, 59 MARQ. L. REV. 1, 68 (1976) (emphasis added).

There is nothing in the rules of civil procedure which prevents a party from moving for summary judgment before discovery is completed. However, a court may not, without erroneously exercising its discretion, grant summary judgment when an opposing party shows by affidavit that he or she cannot at that time present by affidavit facts essential to justify his or her opposition.

3 JAY E. GRENIG & WALTER L. HARVEY, WISCONSIN PRACTICE § 208.5 (2d ed. 1994), states that:

> Subsection (4) [of § 802.08] protects a party opposing a summary judgment motion who for valid reasons cannot by affidavit or other authorized means present facts essential to justify the party's opposition to the motion.
>
> A party who seeks the protection of Subsection (4) must state by affidavit the reasons why the party is unable to present the necessary opposing material . . . . The affidavit need not contain evidentiary facts going to the merits of the case; it is merely a sworn statement explaining why these facts cannot yet be presented.

(Citing WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2742). In *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*,

28 F.3d 1388, 1396 (5th Cir. 1994), the court stated as follows:

> "Rule 56 does not require that *any* discovery take place before summary judgment can be granted; if a party cannot adequately defend such a motion, Rule 56(f) is his remedy." Thus, that more time was scheduled for discovery does not, by itself, defeat summary judgment. The [plaintiffs] must satisfy Rule 56(f), a rule which "may not be invoked by the mere assertion that discovery is incomplete; the opposing party must demonstrate 'how the additional time will enable him to rebut the movant's allegations of no genuine issue of material fact.' " "[T]he nonmovant's 'casual reference to the existence of ongoing discovery falls far short of showing how the desired time would enable it to meet its burden in opposing summary judgment.' "

(Quoted sources omitted); *see also Burns v. Gadsen State Community College*, 908 F.2d 1512, 1519-20 (11th Cir. 1990) (district court should have delayed its decision on the merits of defendant's motion for summary judgment until responses to interrogatories had been filed); *Dunkin' Donuts of America, Inc. v. Metallurgical Exoproducts Corp.*, 840 F.2d 917, 919 (Fed. Cir. 1988) (summary judgment is inappropriate unless a tribunal permits the parties adequate time for discovery); *Klingele v. Eikenberry*, 849 F.2d 409, 412 (9th Cir. 1988) (summary judgment is disfavored where relevant evidence remains to be discovered); *First Chicago Int'l v. United Exchange Co.*, 836 F.2d 1375, 1381 (D.C. Cir. 1988) (plaintiff must have "a full opportunity to conduct discovery.").

Plaintiffs showed by the engineer's report and their expert witness's testimony and affidavit that they could not present at that time facts essential to justify

their position. However, they did show that they could provide that evidence through on-going investigation, particularly the proceedings before DNR. Section 802.08(4), STATS., required that the trial court give them that opportunity.

For these reasons, I respectfully dissent.