Ronald J. Dakter and
Kathleen M. Dakter,
Plaintiffs-Respondents-Cross-Appellants,

v.

Dale L. Cavallino,
Hillsboro Transportation Company, LLC and
Michigan Millers Mutual Insurance Company,
Defendants-Appellants-Cross-Respondents.†

Court of Appeals

*No. 2013AP1750. Submitted on briefs April 14, 2014.
—Decided October 9, 2014.*

2014 WI App 112

(Also reported in 856 N.W.2d 523.)

† Petition for review filed.

434

On behalf of the defendants-appellants-cross-respondents, the cause was submitted on the briefs of *Paul D. Curtis* and *Timothy M. Barber* of *Axley Brynelson, LLP*, Madison.

On behalf of the plaintiffs-respondents-cross-appellants, the cause was submitted on the briefs of *John R. Orton* of *Curran, Hollenbeck & Orton, S.C.*, Mauston.

A nonparty brief was filed by *William C. Gleisner, III* of *Law Offices of William Gleisner*, Hartland, and *Lynn R. Laufenberg* of *Laufenberg, Jassack & Laufenberg*, Milwaukee, for Wisconsin Association For Justice.

Before Blanchard P.J., Lundsten and Kloppenburg, JJ.

¶ 1. BLANCHARD, P.J. In this negligence case, a semi-trailer truck collided with a car, seriously injuring the car driver, Ronald Dakter. At trial, the jury returned

verdicts finding both Dakter and the truck driver, Dale Cavallino, causally negligent, but apportioning the majority of the fault to Cavallino. Damages awarded by the jury included $31,668 to Dakter's wife, Kathleen Dakter, for past and future nursing services that she had provided to, and would yet provide to, Dakter as a result of his accident-related injuries.

¶ 2. On appeal, Cavallino, his employer, and his employer's insurer[1] appeal the judgment on the verdicts and the order denying Cavallino's motions after verdict. Cavallino argues that the circuit court: (1) should have granted Cavallino's motions for summary judgment, for judgment notwithstanding the verdict, and for a change in the jury's verdict apportioning negligence, all on the grounds that, as a matter of law, Dakter's negligence must have exceeded Cavallino's, because it is uncontested that Dakter did not yield to Cavallino's right-of-way; (2) in two instructions, erroneously instructed the jury that (a) as a professional truck driver, Cavallino must be held to a heightened duty of care, and (b) Cavallino could not rely on his right-of-way; (3) erroneously exercised its discretion in excluding testimony from a deputy sheriff who responded to the accident scene; and (4) erroneously allowed to stand the nursing services damages award. For the reasons explained below, we reject each of these arguments and accordingly affirm the judgment and the order.[2]

---

[1] The parties do not point to any distinctions among the three defendants-appellants pertinent to any issue on appeal. Therefore, we use "Cavallino" interchangeably to refer to Dale Cavallino individually and to the defendants-appellants collectively.

[2] We do not reach either of the two arguments raised by the Dakters in a cross-appeal, because the Dakters ask us to address these arguments only if we were to remand based on relief sought by Cavallino, and we are not doing so.

## BACKGROUND

¶ 3. The accident occurred on a May afternoon at the four-way intersection of (1) the two-lane State Trunk Highway 80, at a point where it runs nearly north-south, and (2) a road called State Trunk Highway 82 to the east and Tilmar Avenue to the west. Traffic entering 80 from either 82 or Tilmar must stop, giving traffic on 80 the right of way.

¶ 4. There was testimony at trial that the roadways were wet at the time of the accident.

¶ 5. Ronald Dakter drove north on 80, intending to turn left onto Tilmar and proceed west. At the same time, a van driven by Wyman Hoiland approached the same intersection on 80, heading south. Hoiland planned to turn left onto 82 to proceed east. Both Dakter and Hoiland signaled left turns and stopped, roughly facing each other across the intersection of 80 and 82/Tilmar.

¶ 6. Cavallino approached the intersection in a 65–foot semi trailer truck, traveling southbound on 80, behind and heading in the same direction as Hoiland.

¶ 7. As the two-lane 80 approaches 82/Tilmar, from each direction, it widens to include lanes that can be used for right turns onto 82 or Tilmar.

¶ 8. Hoiland testified that, while stopped at the intersection waiting to turn left, he glanced in his rearview mirror and saw "[a] big truck coming down on top of me." Cavallino's truck moved into the right lane and around Hoiland's van, before colliding with Dakter's car as Dakter was making a left turn. This occurred in front of Hoiland's car, "off to the right."

¶ 9. Contrary to Hoiland's testimony, Cavallino testified that Hoiland had already executed his left turn by the time Cavallino's truck reached the intersection.

Therefore, Cavallino testified, he did not have to, and did not, move into the right lane. Instead, he testified, he remained in the through lane, that is, in the same lane he had been using before 80 widened to include the right lane, before colliding with Dakter's turning car.

¶ 10. The speed limit for traffic traveling on 80 at this intersection was 45 miles per hour. Cavallino testified that he was operating his truck at approximately 40 miles per hour just before the accident. Cavallino also testified that his right foot had "barely got on the brake" when his truck hit Dakter's car.

¶ 11. After the Dakters filed this negligence action, Cavallino moved for summary judgment on the grounds that: Ronald Dakter was negligent as a matter of law for failing to keep a proper lookout and failing to yield the right of way to Cavallino as Dakter made his left turn; Cavallino was merely reacting to an emergency at the time of the collision, namely, Dakter's unexpected turn; and Ronald Dakter was more negligent than Cavallino as a matter of law. The court denied this motion, concluding that there were disputed material issues that required a trial.

¶ 12. Consistent with these summary judgment arguments, Cavallino argued during the course of the ten-day trial that Ronald Dakter failed to yield the right-of-way, inexplicably turning directly into the path of the semi trailer truck. Cavallino's position was that his speed was below the speed limit and appropriate for conditions. Cavallino argued that he had remained in the through lane and had no reason to suspect that Dakter would suddenly turn in front of him, violating Cavallino's undisputed right-of-way.

¶ 13. For their part, the Dakters argued at trial that, at the time of the accident, Cavallino: was driving at an unreasonable speed for conditions at that loca-

tion; failed to exercise proper lookout; followed Hoiland's van too closely; failed to use ordinary care to keep his truck under control; violated truck driving safety standards; and acted recklessly in passing Hoiland on the right. As part of these arguments, the Dakters contended that Ronald Dakter's view of the truck was at least partially obscured before Dakter turned, and that Cavallino abruptly moved to the right lane, after nearly rear ending Hoiland's van, while driving too fast for conditions. The Dakters argued that it was all the more difficult for Dakter to notice the white truck because it came up fast from behind Hoiland's gray van on a rainy, gray day.

¶ 14. The jury found both Cavallino and Dakter causally negligent in operating their vehicles and assigned the following percentages of fault: 65 percent to Cavallino; 35 percent to Dakter. The only aspect of damages pertinent here is that the jury awarded Kathleen Dakter $31,668 for past and future nursing services in providing care for Ronald following the accident.

## DISCUSSION

### I. WAS DAKTER MORE NEGLIGENT THAN CAVALLINO, AS A MATTER OF LAW, BECAUSE DAKTER FAILED TO YIELD TO CAVALLINO'S RIGHT-OF-WAY?

¶ 15. Cavallino argues that "it simply does not matter whether the jury thought Cavallino was driving too fast or did not keep a proper lookout," because Dakter was more negligent than Cavallino as a matter of law, due to the fact that Dakter failed to yield to Cavallino's right-of-way. From this, Cavallino argues that the circuit court "applied the wrong legal standard"

444

in denying his motion for judgment notwithstanding the verdict (JNOV) and his motion to change the verdict to reflect that Dakter was more negligent than Cavallino. As we now explain, this right-of-way argument rests on a faulty legal premise and therefore fails.[3]

■

¶ 16. A party may move for judgment notwithstanding the verdict when "the verdict is proper but, for reasons evident in the record which bear upon matters not included in the verdict, the movant should have judgment." WIS. STAT. § 805.14(5)(b) (2011–12).[4] In other words, a JNOV motion assumes that a jury verdict is supported by sufficient evidence, but asserts that judgment should be granted to the moving party on grounds other than those decided by the jury. *Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 176–77, 557 N.W.2d 67 (1996); *see also Wozniak v. Local 1111 of the United Elec.,*

---

[3] We reject an additional right-of-way argument that Cavallino makes, in the summary judgment context, as entirely deficient, putting to the side the faulty legal premise we explain in the text. Cavallino makes no reference to summary judgment methodology, nor to the submissions of the parties on summary judgment. We cannot tell if he means to argue that the complaint does not state a claim for relief, that the answer did not join issue, or that Cavallino's affidavits made a prima facie case for summary judgment and the affidavits of the Dakters did not raise genuine issues of material fact requiring a trial. *See Hoida, Inc. v. M & I Midstate Bank*, 2006 WI 69, ¶ 16, 291 Wis. 2d 283, 717 N.W.2d 17. Cavallino cites to evidence reflected in portions of the trial transcript, which have no place in summary judgment methodology. *See Ixonia State Bank v. Schuelke*, 171 Wis. 2d 89, 94, 491 N.W.2d 772 (Ct. App. 1992) ("The purpose of summary judgment is to avoid trial when there are no issues to be tried.").

[4] All references to the Wisconsin Statutes are to the 2011–12 version unless otherwise noted.

*Radio & Mach. Workers of Am.*, 57 Wis. 2d 725, 733, 205 N.W.2d 369 (1973) (motion for JNOV is effectively a postverdict motion for directed verdict).

¶ 17. A motion for JNOV presents a question of law, and therefore we apply a de novo standard of review. *Management Computer Servs.*, 206 Wis. 2d at 177.

¶ 18. As for our review of a motion to change a jury verdict,

> Appellate courts do not upset a jury verdict if there is any credible evidence to support it. "Weighing testimony and evaluating credibility of witnesses are matters for the jury." In reviewing a jury verdict, "evidence will be viewed in the light most favorable to the verdict" and courts "search for credible evidence that will sustain the verdict, not for evidence to sustain a verdict the jury could have but did not reach."

*K & S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 2007 WI 70, ¶ 38, 301 Wis. 2d 109, 732 N.W.2d 792 (citations and quoted sources omitted). In addition, the bar is yet higher here, because the circuit court upheld the jury's findings on motions after verdict. *See Morden v. Continental AG*, 2000 WI 51, ¶ 40, 235 Wis. 2d 325, 611 N.W.2d 659. We will not overturn the jury's verdict in such a case unless "there is such a complete failure of proof that the verdict must be based on speculation." *Coryell v. Conn*, 88 Wis. 2d 310, 315, 276 N.W.2d 723 (1979).

¶ 19. Cavallino's argument that the circuit court erred in denying his motions for a JNOV and to change the jury verdict rests on his assertion that under Wisconsin cases, as a matter of law, "a driver [who] fails

to yield the right-of-way is more negligent than an oncoming driver with the right-of-way" when there is an accident involving the two drivers.

¶ 20. Cavallino relies primarily on *Kasper v. Kocher*, 240 Wis. 629, 4 N.W.2d 158 (1942), and *Braun v. Baudhuin*, 243 Wis. 107, 9 N.W.2d 596 (1943). However, those cases are readily distinguishable from this one on the same grounds. In *Kasper*, a driver who was approaching a highway from a driveway "ought to have observed" that the truck about to collide with the driver "was approaching at such speed and in such manner" that the first driver could not enter the highway safely, whereas here there was a dispute about Dakter's ability to see Cavallino's truck. *See Kasper*, 240 Wis. at 633. Similarly, the jury in *Braun* explicitly found that the driver of a car was "causally negligent in his failure to keep a proper lookout" for the truck that collided with his car on a highway. *Braun*, 243 Wis. at 110.

¶ 21. Moreover, the Dakters accurately cite authority from our supreme court, postdating *Kasper* and *Braun*, explicitly rejecting the proposition now advanced by Cavallino, that any driver who fails to yield a right-of-way to any oncoming driver is more negligent than the oncoming driver, as a matter of law. *See Pucci v. Rausch*, 51 Wis. 2d 513, 516–17, 187 N.W.2d 138 (1971) ("In [*Grana v. Summerford*, 12 Wis. 2d 517, 521, 107 N.W.2d 463 (1961)], this court rejected the contention that making a left turn across the path of an approaching car would constitute at least 50 percent negligence as a matter of law, *choosing instead to decide such cases on their individual facts.*" (emphasis added)); *see also Kenwood Equip., Inc. v. Aetna Ins. Co.*, 48 Wis. 2d 472, 478, 180 N.W.2d 750 (1970) (citing *Grana* for the proposition that "[a] breach of a safety statute

447

does not establish as a matter of law the degree of contribution of the negligence to an accident").

██

¶ 22. Cavallino's attempts to distinguish *Pucci* and *Grana* are undermined by evidence presented at trial that includes testimony from the Dakters' experts, Cavallino's supervisor, and Hoiland. We now summarize some of that testimony and then turn to Cavallino's attempts to distinguish the two Wisconsin Supreme Court opinions.

¶ 23. Jeff Peterson, a registered professional engineer and accident reconstruction expert, expressed the opinion that Cavallino was travelling "between 39 and 45 miles per hour at the [moment of] impact" with the Dakter car. In the absence of skid marks on the scene (consistent with Cavallino's testimony that he had "barely got on the brake" at the time of impact), Peterson said it was not possible to say precisely how fast Cavallino was travelling before impact.

¶ 24. Peterson also concluded that, shortly before the collision, Cavallino moved to his right, to avoid hitting Hoiland's van, and the collision with Dakter occurred in what would be an extension of the right lane into which Cavallino moved, just to the west of what would have been an extension of the through lane for Cavallino. Thus, Peterson testified, at the time of the collision, Dakter had already executed enough of his left turn that he had cleared the extension of Cavallino's through lane. Cavallino had to have shifted to the right, Peterson testified, and could not have remained in the through lane as Cavallino testified, because if Cavallino had remained in the through lane, his truck would have missed Dakter's car, driving behind Dakter as Dakter completed his left turn. Peterson also testified that, before Dakter started his left turn, Dakter's view of

448

Cavallino's truck was substantially obscured, if not completely blocked, by Hoiland's van.

¶ 25. The Dakters also called Charles Collins, the director and associate Dean and a retired instructor for a technical college truck driver training program. Collins testified in part to five rules that he said are "universally taught in all truck driving schools" and "universally adopted by C[ommercial] D[rivers] L[icense] . . . examiners when they score prospective drivers." These are that a truck driver entering an intersection must: (1) "slow down, always be prepared to stop"; (2) "cover your brakes" (place the right foot over the brake pedal); (3) "make sure you look left, right, and left again"; (4) "never change lanes in an intersection"; and (5) "make sure the path is clear."

¶ 26. Collins testified that, assuming the accuracy of Hoiland's testimony that Cavallino moved to his right to drive around Hoiland's stopped van just before the accident, Cavallino's driving was "absolutely not" compliant with standards and practices in the truck driving industry. Under this scenario, Cavallino would have been violating the strict rule, number 4 above: "Never do you pass in an intersection." In addition, 40 miles per hour would have been "far too fast," given the long stopping times need for trucks. This was partly because the pavement was wet and also because Cavallino's trailer was empty. It takes longer to stop a truck with an empty trailer, since a lighter trailer generates less friction with the road surface. "The congestion within the intersection, the wet pavement, the empty trailer . . . [were] factors [that] should have been considered and his speed should have been adjusted significantly lower" than 40 miles an hour.

¶ 27. Under cross-examination, Collins acknowledged that he was not aware of a rule in the Wisconsin

449

Motorists' Handbook that prohibits passing another vehicle while travelling through an intersection. Instead, it was Collins's "professional opinion" that truck drivers should not use a right lane of the type at issue here to pass a vehicle that has stopped to turn left.

¶ 28. The jury also learned that Cavallino's own supervisor and the safety director of the Hillsboro Transportation Company, Robert Stekel, testified in a pretrial deposition that it is "not safe" for the driver of a semi tractor trailer to pass a vehicle stopped in an intersection, on the vehicle's right, at 40 miles an hour.

¶ 29. With that background, we turn to Cavallino's attempts to distinguish *Pucci* and *Grana*. Cavallino argues that here, unlike in *Pucci*, the only evidence before the jury was that Ronald Dakter "deliberately invaded Cavallino's lane of travel." It is not necessary to review the facts of *Pucci*, because Cavallino's premise that the jury was obligated to find that Dakter "deliberately invaded" Cavallino's right-of-way is faulty. As summarized above, the Dakters presented evidence that Cavallino's truck was fully or partially obscured to Dakter's vision at the critical moment for multiple reasons, one being that Cavallino allegedly turned his truck to the right abruptly as he neared the intersection, at a point where 80 has a slight curve, and another being that Hoiland's van blocked Dakter's view of Cavallino's truck. This supported a cogent argument that the Dakters' attorney made to the jury: "[Y]ou can't yield to something you can't see."

¶ 30. Cavallino attempts to distinguish *Grana* on the grounds that here, unlike in *Grana*, there was "no basis" for a finding that Cavallino was driving his truck too fast for the conditions under all circumstances. Again, we need not refer to the facts of *Grana*, because

450

the premise here is also faulty: there were multiple grounds on which the jury could have concluded that Cavallino was driving his truck too fast for the conditions. This included expert testimony that Cavallino should have been driving no greater than 30 miles an hour as he approached Hoiland's stopped van at the intersection, regardless of the speed limit of 45. And, the testimony from Hoiland, contradicting Cavallino, that Hoiland had not already made his left-hand turn at the time of the collision provided a basis for the jury to question every aspect of Cavallino's testimony, including Cavallino's testimony that he was sufficiently attentive and traveling at a safe speed for the circumstances at the time of the accident.

¶ 31. In sum, Cavallino's argument is premised on a misunderstanding of the law and consists almost entirely of emphasizing testimony favorable to his theory of the case. It is true that there was evidence to support Cavallino's theory of what his counsel repeatedly argued to the jury was "a very simple case." However, it is the same here as in *Pucci*: "If the jury accepted [the defendant's] version, no doubt [the plaintiff] would be more negligent than [the defendant] in making a left turn . . . in front of him, but the jury did not accept his version of the accident." *See Pucci*, 51 Wis. 2d at 517. As explained above, the law does not compel the conclusion that Dakter was more negligent than Cavallino, and there was at least some evidence supporting the Dakters' arguments that Cavallino was more negligent than Dakter. Thus, the circuit court correctly denied Cavallino's motions for JNOV or to change the verdict.

## II. INSTRUCTIONS: ALLEGED HEIGHTENED DUTY OF CARE AND PASSING ON THE RIGHT

¶ 32. Cavallino challenges two aspects of the jury instructions. The first we will call the truck driver instruction (although, as referenced below, this was not a stand alone instruction, but a part of the negligence instructions). The second challenged instruction we will call the passing-on-the-right instruction. Cavallino argues that both instructions were erroneous statements of the law and that the only "way to explain" the jury's attribution of 65 percent negligence to him is that the jury was misled by one or both of these instructions. For the following reasons, we conclude that, assuming without deciding that the truck driver instruction misstated a legal principle, its use was not prejudicial, and that the passing-on-the-right instruction was an accurate statement of the law.

■■■■■■

¶ 33. Our standard of review is well established:

A trial court has wide discretion as to the instructions it will give to a jury in any particular case. Instructions must fully and fairly inform the jury as to the applicable principles of law . . . . The instructions given are to be considered in their totality to determine whether they properly state the law to be applied.

If the instructions are not erroneous and adequately inform the jury as to the law to be applied, the court's exercise of discretion will be affirmed on appeal. If an instruction is erroneous . . . , a new trial will not be ordered unless the court's error was prejudicial. An error is prejudicial only if it appears that the result would have been different had the error not occurred.

*Anderson v. Alfa–Laval Agri, Inc.*, 209 Wis. 2d 337, 344–45, 564 N.W.2d 788 (Ct. App. 1997) (citations and quoted sources omitted).

### A. Truck Driver Instruction

¶ 34. Cavallino argues that the truck driver instruction, requested by the Dakters, directed the jury to subject Cavallino to "a heightened duty of care because he is a professional truck driver," contrary to the general negligence standard that creates for every person an identical duty, namely, the duty to use ordinary care to avoid conduct that a reasonable person would recognize creates an unreasonable risk of injury or damage.

¶ 35. The truck driver instruction stated in pertinent part:

> At the time of the accident, the defendant, Dale Cavallino, was a professional truck driver, operating a semi tractor trailer pursuant to a Commercial Driver's License issued by the State of Wisconsin. As the operator of a semi tractor-trailer, it was Dale Cavallino's duty to use the degree of care, skill and judgment which reasonable semi truck drivers would exercise in the same or similar circumstances, having due regard for the state of learning, education, experience, and knowledge possessed by semi truck drivers holding Commercial Driver's Licenses. A semi truck driver who fails to conform to this standard is negligent.[5]

¶ 36. As we now explain, assuming without deciding that this portion of the instructions was inaccurate

---

[5] There is no dispute about the factual assertions in the truck driver instruction. At the time of the accident, Cavallino was an experienced professional truck driver and was authorized to operate a semi tractor truck because he held a Wisconsin commercial driver's license. Counsel for Cavallino empha-

to the extent that it may have suggested that all professional truck drivers, such as Cavallino, must be held to a higher standard of care than other drivers, such as Dakter, we conclude that the result would not have been different if the court had not given this instruction. We base this conclusion on the pertinent legal standards, additional instructions given the jury, and related testimony given and arguments made at trial.

¶ 37. The parties agree that it would have been improper for the circuit court to have instructed the jury that Cavallino must be held to a higher standard of care than exists for other drivers because he was a professional truck driver. The Dakters acknowledge that the "standard of care for all drivers is 'ordinary care.' " This is an appropriate concession. As our supreme court has explained:

> Every person has a duty to use ordinary care in all of his or her activities, and a person is negligent when that person fails to exercise ordinary care. In Wisconsin a duty to use ordinary care is established whenever it is foreseeable that a person's act or failure to act might cause harm to some other person. Under the general framework governing the duty of care, a " 'person is not using ordinary care and is negligent, if the person, without intending to do harm does something (or fails to do something) *that a reasonable person* would recognize as creating an unreasonable risk of injury or damage to a person or property.' "

*Alvarado v. Sersch*, 2003 WI 55, ¶ 14, 262 Wis. 2d 74, 662 N.W.2d 350 (emphasis added) (citations and quoted sources omitted).

---

sized this to the jury during his closing argument: "Mr. Cavallino has been driving [a] semi every day for almost 31 years now."

¶ 38. The jury here was accurately instructed on the general standard of care, in a portion of the instructions that immediately preceded the truck driver instruction:

> A person is negligent when [he or she] fail[s] to exercise ordinary care. Ordinary care is the care which a reasonable person would use in similar circumstances. A person not using ordinary care is negligent, if the person without intending to do harm does something or fails to do something that a reasonable person would recognize as creating an unreasonable risk of injury or damage to a person or property.

¶ 39. We turn now to one application of this general standard of care: in evaluating whether an actor has acted as a reasonable person would, jurors may consider the actor's superior knowledge or skills when the knowledge or skills give the actor an ability to avoid injury or damage to others. If someone "has skills or knowledge that exceed those possessed by most others, these skills or knowledge are circumstances to be taken into account in determining whether the actor *has behaved as a reasonably careful person*." RESTATEMENT (THIRD) OF TORTS: LIAB. FOR PHYSICAL AND EMOTIONAL HARM § 12 (2010) (emphasis added). This comports with common sense notions of ordinary care. "In determining which dangers [a person acting reasonably] knows or should know of, and which precautions the person can appropriately adopt, it simply is not possible to ignore what knowledge the person actually has." RESTATEMENT § 12 cmt. a.

¶ 40. Putting together the general standard of care with its application to the circumstances in which an actor possesses pertinent superior knowledge or skills: (1) all have a duty to use ordinary care to avoid

acts that *a reasonable person* would recognize create unreasonable risks of injury or damage to others or property, and (2) *a "reasonable person* will act in the light of (a) knowledge shared by the community generally and also (b) information, knowledge and skill that he himself has that is not generally known and that reasonable people would not ordinarily have." DAN B. DOBBS ET AL., THE LAW OF TORTS § 132 (2d ed. 2014) (emphasis added).

¶ 41. Both the general standard of care and its application to those with superior knowledge or skills have long been recognized in Wisconsin law. In *Osborne v. Montgomery*, 203 Wis. 223, 234 N.W. 372 (1931), an opinion cited by the Dakters but not addressed by Cavallino, our supreme court first gave the following general definition of negligence, consistent with the passage from *Alvarado* cited above:

> Every person is negligent when, without intending to do any wrong, he does such an act, or omits to take such a precaution that, under the circumstances present he, *as an ordinarily prudent person,* ought reasonably to foresee that he will thereby expose the interests of another to an unreasonable risk of harm. In determining whether his conduct will subject the interests of another to an unreasonable risk of harm, a person is required to take into account such of the surrounding circumstances as would be taken into account *by a reasonably prudent person and possess such knowledge as is possessed by an ordinarily reasonable person* and to use such judgment and discretion *as is exercised by persons of reasonable intelligence and judgment under the same or similar circumstances.*

*Osborne*, 203 Wis. at 242–43 (emphasis added). The *Osborne* court then added the following further explanation, consistent with the Restatement's superior knowledge or skills formulation quoted above, citing

the then-existing version of the Restatement on the same topic: "If the actor in a particular case in fact has superior perception or possesses superior knowledge, he is required to exercise his superior powers in determining whether or not his conduct involves an unreasonable risk of injury to the interests of another, . . ." *Id.* at 243 (citing the then current RESTATEMENT OF THE LAW OF TORTS § 170).

¶ 42. With this background, we return to the truck driver instruction here. To recap, the jury was correctly instructed on the general standard of care (see ¶ 38), and then given the truck driver instruction (see ¶ 35).

¶ 43. The substance of the truck driver instruction was correct, to the extent that it was understood as a direction that the jury should factor into its negligence determinations "the state of learning, education, experience, and knowledge possessed by" Cavallino. Under this view, the jury was to consider the relevant circumstances of Cavallino's superior knowledge and skills in operating his truck, factoring into the negligence calculation whatever the evidence showed regarding his knowledge and skills as to the safe operation of his truck that might have exceeded the knowledge or skills possessed by most other people. *See Cervelli v. Graves,* 661 P.2d 1032, 1037 (Wyo. 1983) (jury in negligence case should have been allowed to consider evidence from which it could have concluded that truck driver involved in accident "was more skillful than others as a result of his experience as a driver").

¶ 44. At the same time, we see at least some danger that the truck driver instruction could have been interpreted by the jury to suggest that Cavallino should be held to a different, higher standard of care than other drivers because he is a professional truck

457

driver. The instruction spoke of Cavallino's "duty to use the degree of care, skill and judgment which reasonable semi truck drivers would exercise in the same or similar circumstances," and appeared to assert that there is a "semi truck driver" standard of care to which all semi truck drivers must conform. If understood this way, it would state the legal doctrine incorrectly. *See Cervelli,* 661 P.2d at 1037–38 ("It is one thing to say that, if so found, a jury can take account of an individual's exceptional knowledge or skill in determining negligence; it is quite another to say that as a matter of law, because he is a truck driver, an individual is held to a higher standard of care than other drivers."); *see also Fredericks v. Castora,* 360 A.2d 696, 698 (Pa. Super. Ct. 1976) ("A requirement that experienced truck drivers be subject to a higher standard of care does not impress us as being a useful concept to infuse into the law of vehicle negligence. An understanding of the ordinary standard of due care applicable to the average motorist under the multitude of changing circumstances likely to confront today's driver is already difficult to grasp and apply justly.").

¶ 45. We will assume without deciding that it was error to give the truck driver instruction because of the potential interpretation that would not be a correct statement of the law, but we conclude that any error was not prejudicial. Cavallino does not provide us with a detailed argument regarding prejudice. Instead, he asserts in a conclusory fashion that the negligence apportionment by the jury is "inexplicabl[e]" and therefore an error in this instruction and the passing-on-the-right instruction must provide the explanation.

¶ 46. Nevertheless, we provide the following explanation for our conclusion that the truck driver instruction was not prejudicial.

■■

¶ 47. First, the distinction at issue is minor. When the superior knowledge or skills doctrine applies, it has the practical effect of holding an actor to a *higher standard of conduct* than he or she would be held to if he or she lacked the superior knowledge or skills. *See LaVine v. Clear Creek Skiing Corp.*, 557 F.2d 730, 734 (10th Cir. 1977) (instruction explaining that "a person having special knowledge must exercise a quantum of care which is commensurate with the circumstances, one of which is his or her special skill and training," "is not easy to expound . . . for the reason that it is capable of creating the impression that a double standard of care exists"). For this reason, it would seem to be at least as likely as not that jurors aiming to apply the instruction would have hit the mark by focusing on evidence of Cavallino's superior knowledge and skills, and not missed the mark by holding him to a separate, higher truck driver standard of care.

¶ 48. Second, Cavallino does not suggest that any other instructions (aside from the passing-on-the-right instruction, discussed below) magnified or compounded the misunderstanding he argues was conveyed by the truck driver instruction. And, when we review the balance of the instructions, it is clear that the jury was repeatedly pointed in the correct direction.

¶ 49. As noted above (¶¶ 37–38), the jury was given a correct summary of the "reasonable person" standard of ordinary care that applies to all. This was followed by the truck driver instruction, which was followed by an instruction on contributory negligence, which included the following statements of law:

459

Every person in all situations has a duty to exercise ordinary care for his or her own safety . . . .

A person must exercise ordinary care to employ his senses of sight and hearing so as to become aware of the existence of danger to him [or her] . . . .

. . . .

. . . A person is only required to act as a reasonably prudent person would act under the same or similar circumstances.

. . . A person is not guilty of negligence in making a choice of conduct if the person has no knowledge that one course of conduct carries a greater hazard than another, provided that such lack of knowledge is not the result of the person's failure to exercise ordinary care.

¶ 50. This was followed by a series of instructions effectively applying the general standard of care to the context of rules that apply to "every user of a highway," such as a rule that "a person using the highway must use ordinary care to avoid" dangers, and a rule that all drivers "must use ordinary care to keep a careful lookout ahead and about him or her for the presence or movement of other vehicles, objects, or pedestrians that may be within or approaching the driver's course of travel." In sum, the jury was repeatedly and clearly reminded of the correct general standard of care.

¶ 51. Third, the jury heard the truck driver instruction after watching Cavallino himself testify and hearing testimony about his trucking experience and about the training and experience of truck drivers that Cavallino would be expected to know. Cavallino had a full opportunity, through his own testimony or by eliciting testimony from other witnesses, to try to convince the jury that his training or experience was not especially broad, or had not equipped him with

460

specialized knowledge in some relevant areas. And, he now presents us with no good reason to conclude that the jury would have failed to apply all evidence at trial in a common sense manner, including facts and inferences going to Cavallino's own pertinent training and experience.

¶ 52. As summarized in part above, the Dakters elicited extensive testimony bearing on the question of how Cavallino could have safely operated his truck under the circumstances to avoid a crash. This involved testimony about his ability to slow or stop the truck on wet pavement, estimated speeds of the truck, the absence of braking by Cavallino, visibility issues for both Dakter and Cavallino, and the potential dangers of driving a truck past a vehicle stopped at an intersection, on the stopped vehicle's right, at 40 miles an hour. It also included testimony about safety rules commonly taught to commercial drivers, which are based on the experiences of truck drivers, and, at least in part, informed by facts that are presumably not commonly known to non-professional drivers. This includes the testimony, referenced above, that a semi-trailer tractor that hauls an empty trailer (as Cavallino's was) is slower to stop, under the same conditions, than the same tractor hauling a freight-bearing trailer, because additional tire-road contact and friction are generated by the extra weight.

¶ 53. Moreover, during the jury instruction conference, while objecting to the truck driver instruction, counsel for Cavallino acknowledged that the experts in the case had "testified that everyone is subject to the same rules of the road," which directly undermines any suggestion by Cavallino now that the expert testimony reinforced an inaccurate view of the standard of care.

¶ 54. Fourth, the closing arguments do not add significant weight to the potential for prejudice. It is true that there were isolated references in the Dakters' closing argument that might have invited the jury to think that there is a higher standard of care for all professional truck drivers. However, in the main the Dakters' attorney asked the jury to consider Cavallino's knowledge and skills in operating his truck and highlighted evidence supporting the theory that Cavallino was "not watching" the road while his "cushion of safety [was] shrinking," as he approached the intersection, because he "zoned out." These aspects of the argument did not suggest a higher standard of care for Cavallino as a truck driver.

¶ 55. In the following extended passage, the Dakters' counsel zeroed in on the subject matter of the truck driver instruction:

> One of the problems in this case is everybody in the courthouse is a driver. That isn't the issue here . . . . [I]n determining the negligence of Mr. Cavallino, you're required by this instruction to require him to follow the care, skill, judgment that truck drivers have, giving due regard for the state of learning, education, and experience and knowledge of truck drivers. That's why we brought truck driving experts in here because we knew the jury wouldn't be filled with truck driving experts.
>
> We provide that information to you so you can apply the law to the facts. [Cavallino] incorrectly used the right turn lane, if he ever was passing, he uses the right turn lane. Now, the Judge read an instruction to you about passing. [Summarizes rule of the road regarding passing on the right] This calls for the driver *to use ordinary care* to determine the presence, location, distance, and speed of any vehicle that might be affected by the driver's passing movement. *Can you pass on the right[?] [S]ure. You can only do so in safety.* And

if you're driving a 40,000–pound semi on wet roads and the trailer is empty, you also have to drive . . . according to the rules and safety standards that professional truck drivers are to follow. Some of the other [jury] instructions have to do with driving at a reasonable and prudent speed. *The law requires that everybody has to drive at a reasonable and prudent speed.*

(Emphasis added.) In a related vein, the Dakters' counsel later argued:

How do you [apportion] fault [between] two drivers? Well, one has an ordinary driver's license and one has a CDL. He drives for a living, and he's supposed to know the special safety standards applicable. You can balance the degree of harm.

One guy is driving a Subaru, and the other guy is driving a 40,000–pound semi on wet roads that had an empty trailer. A semi is harder to maneuver, slow down, and can cause more damage, more injury. You can compare the rules that they violated.

¶ 56. Read together, these passages adequately conveyed to the jury both sides of the equation. "Everybody" has the same duty of care in following the specific rules of the road provided by the court. However, when "you're driving a 40,000–pound semi" and have experience doing so, then that is a relevant circumstance. The driver with the CDL needs a CDL because he or she is operating a much larger, less maneuverable, more dangerous vehicle that he or she learns to operate in a safe manner. Read in context, the reference to experts appears to have been an invitation for the jury to consider what those experts had to say about the pertinent skills and experience possessed by someone who has operated trucks for thirty-one years, such as Cavallino, as part of their deliberation as to whether Cavallino violated the ordinary standard of care.

¶ 57. Moreover, in his closing argument, counsel for Cavallino took the opportunity to remind the jury that there is only one standard of care in this "very simple case." He argued that "Mr. Dakter has got a duty of lookout, all drivers do, in fact, even Mr. Cavallino." Addressing the expert testimony contrary to Cavallino's theory of the case, his attorney asked the jury to consider Cavallino to be the most authoritative voice on safety issues, arguing that Cavallino had "more experience than all the experts combined in this case, even [Cavallino's experts]."

¶ 58. For these reasons, assuming without deciding that it was error to give the truck driver instruction as phrased, we are confident that the result would have been the same if it had not been given.

### B. Passing-on-the-Right Instruction

¶ 59. Cavallino's objection to the passing-on-the-right instruction was not clearly articulated at the trial level and his related argument is not well developed on appeal. In any case, we reject it for the following reasons.

¶ 60. The passing-on-the-right instruction given by the court stated:

> A safety statute provides that the operator of a vehicle may overtake and pass another vehicle on the right, provided the vehicle remains on the roadway or paved shoulder and provided the vehicle is able to pass under conditions permitting the movement in safety.
>
> This statute requires the driver of the passing vehicle to use ordinary care to make an efficient lookout. This calls for the driver to use ordinary care to determine the presence, location, distance, and speed of any vehicle that might be affected by the driver's

passing movement. This requires the passing driver to drive his vehicle at a speed that is reasonable and prudent under existing conditions having regard for actual and potential hazards. After having made these observations, the passing driver must also use reasonable judgment in calculating the time required to safely pass without interfering with other vehicles within or approaching the passing vehicle's course of travel.

¶ 61. Cavallino's first argument is that this instruction "completely misstates" a statute on which it is partially based, WIS. STAT. § 346.08, in that it informed the jury that, even if Cavallino did not violate § 346.08, "he could still be found negligent."

¶ 62. WISCONSIN STAT. § 346.08 provides:

The operator of a vehicle may overtake and pass another vehicle upon the right only under conditions permitting the movement in safety and only if the operator can do so while remaining on either the roadway or a paved shoulder, and then only under the following conditions:

(1) When the vehicle overtaken is making or about to make a left turn or U-turn; or

(2) Upon a street or highway with unobstructed pavement of sufficient width to enable 2 or more lines of vehicles lawfully to proceed, at the same time, in the direction in which the passing vehicle is proceeding; or

(3) Upon a one-way street or divided highway with unobstructed pavement of sufficient width to enable 2 or more lines of vehicles lawfully to proceed in the same direction at the same time.

¶ 63. Cavallino's first argument is unavailing because Cavallino does not explain why the court was limited, on this topic, to a strict recitation of the terms of WIS. STAT. § 346.08, nor does he elaborate on which

aspect or aspects of the passing-on-the-right instruction misconstrued the terms of § 346.08. Moreover, as the Dakters explain, the passing-on-the-right instruction was informed in part by WIS JI—CIVIL 1354, which is based on WIS. STAT. § 346.34(1)(a)3. Section 346.34(1)(a)3. provides that a driver may not "[t]urn a vehicle from a direct course or move right or left upon a roadway unless and until such movement can be made with reasonable safety." As referenced above, central to the Dakters' theory of the case was the allegation that Cavallino unsafely moved to the right at the last moment.

¶ 64. Cavallino's second argument is that the final sentence of the passing-on-the-right instruction inaccurately informed the jury that he was required to pass on the right "without interfering with other vehicles within or approaching the passing vehicle's course of travel." Cavallino's argument appears to rest on the premise that the jury must have understood the final sentence to mean that it could or should disregard the concept of right-of-way, and that it could or should ignore his principal argument to the jury that at the time of the accident he was driving safely in a lane that gave him the right-of-way. This is plainly an unreasonable assumption.

■■■

¶ 65. A reasonable reading of the final sentence of the passing-on-the-right instruction is that even a driver who has the right-of-way must still exercise the same reasonable prudence that all drivers must exercise at all times to try to avoid interfering with other vehicles. A simple example illustrates the point. A driver approaching an intersection controlled by traffic lights who has every reason to believe that she will have a right-of-way under a green light would not be driving

safely if, throughout her final approach to and passage through the intersection, she turned her full attention to the phone in her hand. She would have the right-of-way, but she would not be proceeding safely.

¶ 66. For these reasons, we are not persuaded that the passing-on-the-right instruction was erroneous.

## III. DEPUTY TESTIMONY

¶ 67. Cavallino argues that the circuit court erred in ruling that a deputy sheriff who investigated the accident would not be allowed to testify as to her conclusions about what caused the accident and whether Ronald Dakter operated his car safely before the collision. For the following reasons, we reject this argument.

¶ 68. Our standard of review is deferential:

> Whether to admit proffered " 'expert' " testimony rests in the circuit court's discretion. On this issue, our review of a circuit court's use of its discretion is deferential, and we apply the erroneous exercise of discretion standard. The circuit court's exercise of discretion will not be overturned if the decision had a "reasonable basis," and if the decision was made "in accordance with accepted legal standards and in accordance with the facts of record." Furthermore, a reviewing court may search the record for reasons to sustain the circuit court's exercise of discretion.

*State v. LaCount*, 2008 WI 59, ¶ 15, 310 Wis. 2d 85, 750 N.W.2d 780 (citations and quoted sources omitted).

¶ 69. In excluding this testimony, the circuit court reasoned that the jury would decide, as "ultimate questions," the questions Cavallino wanted to pose to the

467

deputy based on evidence that would include the testimony of accident reconstruction experts called by both sides, as well as the testimony of those involved and eyewitnesses. The court stated in part:

> In terms of [the deputy's] training and experience as it relates to causation, I do believe that that testimony is better left to the experts that were the engineers [able] to reconstruct the accident, to look at the various measurements that were taken, to look at the speeds of the various vehicles, and then render opinions rather than have an officer who was at the scene for a brief moment or at the scene momentarily and not having all the facts necessary to render an opinion.

¶ 70. In addition, the court noted, the two sides were presenting the jury with "diametrically opposed" factual descriptions of what happened, with Cavallino testifying that he drove straight through the intersection and the Dakters contending that he drove around Hoiland. Given these dynamics, testimony from the deputy as to her opinions "may make it more difficult for the jury to make a decision" based on the eyewitness and other expert testimony.

¶ 71. On appeal, Cavallino does not present a summary of the content of the testimony that the court's ruling prevented the deputy from giving. The Dakters argue that Cavallino forfeited this argument because he failed to make an adequate offer of proof to the circuit court as to what the deputy would have testified to. Putting to the side the merits of a forfeiture argument, it is difficult for us to see any merit in Cavallino's argument that the circuit court erroneously exercised its discretion when we lack a clear statement of the deputy's testimony, including grounds for any conclusions she had that might have differed from conclusions offered by others who testified at trial.

Cavallino's briefing does not demonstrate that he provided the circuit court with a basis to conclude that the deputy was in the possession of relevant data or perspective, without which the jury might have been misled by eyewitness or other expert testimony. And, Cavallino does not explain why any such data or perspective would not have been cumulative to testimony given by the witness who did testify.

¶ 72. In sum, the circuit court gave the issue thoughtful consideration, with a reasonable result, and Cavallino fails to explain why we should conclude that this discretionary decision was erroneous.

## IV. PAST AND FUTURE NURSING SERVICES DAMAGES

¶ 73. Cavallino acknowledges that the Dakters elicited testimony at trial that Kathleen Dakter provided nursing services for her husband after the accident, which, at least to a degree, supported the Dakters' request to the jury that resulted in an award of $31,668. He also concedes that "in general, plaintiffs can recover damages for in-home nursing care." Cavallino argues, however, that when he argued in a post-trial motion that the evidence was insufficient to sustain this award, the circuit court erred in failing to change this damages award to $0, to require the Dakters to accept an award on this question of $0, or to order a new trial on damages. As we now explain, this argument came too late.

¶ 74. On this issue, without objection from Cavallino, the jury was instructed to answer the following question: "What sum of money will fairly and reasonabl[y] compensate Kathleen Dakter for her damages [in providing] past and future nursing services[?] $____ " (formatting and capitalization altered).

¶ 75. Also without objection from Cavallino, the jury was instructed as follows:

> Subdivision b of question 7 asks what sum of money will compensate Kathleen Dakter for personal nursing care and services rendered to her husband. If you find that Kathleen Dakter performed services in nursing and caring for her husband and that the services were necessarily rendered because of his injuries, you should name such sum as you feel will fairly and reasonably compensate Kathleen Dakter for the personal nursing care and services, not exceeding the amount for which Kathleen Dakter could have employed others to do the work. If you find that for any foreseeable time in the future she will be performing such necessary services, you should also make reasonable allowance for the future services.

¶ 76. Also without objection from Cavallino, counsel for the Dakters argued to the jury that Kathleen Dakter provided nursing services for which she should be compensated. On this topic, Cavallino's counsel had not a word to say in closing argument.

¶ 77. For the first time in his post-trial motion and now on appeal, Cavallino points to legal authority for the proposition that damages for nursing services are available only when proof has been presented establishing customary fees for similar services. Putting aside the legal merits of Cavallino's argument, Cavallino forfeited the argument by failing to timely raise it. *See* WIS. STAT. § 805.13(3) ("Failure to object at the conference constitutes a waiver of any error in the proposed instructions or verdict."); *see also State v. Ndina*, 2009 WI 21, ¶ 30, 315 Wis. 2d 653, 761 N.W.2d 612.

470

¶ 78. If there was a complete failure of proof on this issue under a legal standard, or if the jury should have been instructed that it could not award these damages without a particular form of proof based on that legal standard, those are legal issues that should have been brought to the attention of the circuit court at a time when the jury could have been correctly instructed. That is, if Cavallino had expressed either of those views at the time of trial, the circuit court could have considered removing this item of damages or otherwise adjusting the instructions or verdict forms. The court was not given that opportunity and we will not upset the verdict entered by the court on this record. *See Schill v. Wisconsin Rapids Sch. Dist.*, 2010 WI 86, ¶ 45 n. 21, 327 Wis. 2d 572, 786 N.W.2d 177 (explaining that "[f]orfeiture is a rule of judicial administration" that encourages parties and counsel to give notice of issues to opposing parties, to diligently prepare in the course of litigation, and to avoid "sandbagging"). Cavallino let the issue ride at trial. We decline to revisit the approaches taken by the jury and the circuit court that Cavallino, through silence, invited them to take.

## CONCLUSION

¶ 79. For these reasons, we affirm the judgment on the verdicts and the order denying Cavallino's motions after verdict.

*By the Court.*—Judgment and order affirmed.