**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**July 19, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2020AP1608**

Cir. Ct. No.  2010CV2601

**STATE OF WISCONSIN**

**IN COURT OF APPEALS**
**DISTRICT III**

FREDERICK W. PREISLER AND TINA L. PREISLER,

PLAINTIFFS-RESPONDENTS-CROSS-APPELLANTS,

V.

KUETTEL'S SEPTIC SERVICE, LLC,

DEFENDANT-APPELLANT-CROSS-RESPONDENT,

4 D-K FARM AND DUKE KUETTEL,

DEFENDANTS-CO-APPELLANTS-CROSS-RESPONDENTS,

DALE KUETTEL, DOUG KUETTEL AND CHERYL KUETTEL,

DEFENDANTS-CROSS-RESPONDENTS,

SECURA INSURANCE, A MUTUAL COMPANY, REGENT INSURANCE
COMPANY AND HASTINGS MUTUAL INSURANCE COMPANY,

DEFENDANTS.

APPEAL and CROSS-APPEAL from a judgment of the circuit court for Outagamie County: CARRIE A. SCHNEIDER, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM. Kuettel's Septic Service, LLC ("KSS"), and Frederick and Tina Preisler (collectively, "the Preislers") each appeal from a judgment awarding monetary damages to the Preislers following a jury trial.[1] The Preislers commenced this action against several parties, including KSS, Duke Kuettel, and 4 D-K Farm (collectively, "the Defendants"). Several experts testified at trial in support of each party. As relevant to this appeal, the jury found that the Defendants negligently spread septage on the Preislers' farm, causing an increased concentration of nitrate-nitrogen ("nitrates") in the Preislers' well water and, in turn, causing damage to the Preislers. The jury also found, however, that Fred was negligent in his farming practices and that his negligence was also a cause of the Preislers' damages. When apportioning responsibility, the jury found Fred and KSS to be equally negligent, and it found Duke and 4 D-K Farm to each be less causally negligent than Fred. Because Fred's causal negligence exceeded the individual causal negligence of Duke and of 4 D-K Farm, the Preislers were only able to recover, from KSS, a portion of their total damages as determined by the jury.

---

[1] Because some of the parties share a surname, we refer to them individually by their first names.

¶2     The parties each raise several issues on appeal.  KSS argues in its appeal that the judgment should be reversed and a verdict should be directed in its favor because there is no credible evidence showing that the Defendants' negligence caused the Preislers' damages or that the Preislers suffered the $500,000 in damages the jury found.  In the alternative, KSS argues that the judgment should be reversed and the cause remanded for a new trial because the jury's verdict is contrary to the great weight of the evidence.

¶3     The Preislers argue in their cross-appeal that the circuit court erroneously determined that the Defendants did not engage in a concerted action under WIS. STAT. § 895.045(2) (2019-20).[2]  They also argue that the court erred by refusing to strike Dr. Richard Wolkowski's testimony.  Finally, the Preislers contest the jury's finding that Fred was negligent, arguing that Fred did not have a duty of care; that Fred acted reasonably under the circumstances; and that there is no credible evidence to support the jury's finding that Fred's actions caused the Preislers' damages.  For the reasons set forth below, we reject the parties' arguments and affirm.[3]

---

[2] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[3] Both parties at times provide citations to the parties' appendixes rather than to the record.  By doing so, the parties have failed to comply with our Rules of Appellate Procedure, which require appropriate references and citations to the record.  *See* WIS. STAT. RULE 809.19(1)(d)-(e); *see also* **United Rentals, Inc. v. City of Madison**, 2007 WI App 131, ¶1 n.2, 302 Wis. 2d 245, 733 N.W.2d 322.  Compliance with the Rules of Appellate Procedure is not optional and is essential to the timely performance of our duties.  Future violations of the Rules of Appellate Procedure may result in sanctions.  *See* WIS. STAT. RULE 809.83(2).

## BACKGROUND

¶4      At all times relevant to this appeal, the Preislers owned and operated a dairy farm, which had been in Fred's family since the late 1800s. Fred's family began operating the farm as a full-time dairy farm in the early 1970s, and Fred began purchasing portions of the farm from his father in the early 1990s.

¶5      In late 2002 or early 2003, Duke approached Fred and asked if septage could be spread on the Preislers' property. Duke and his brothers, Doug Kuettel and Dale Kuettel, owned 4 D-K Farm (a farm located just across the road from the Preislers' property) and KSS (a business that collects and disposes of septic tank waste, which is commonly referred to as "septage"). Duke explained to Fred that the septage would be a "free fertilizer." Fred eventually permitted septage to be spread on certain fields. Fred testified at trial that he conditioned his consent on KSS following the regulations for spreading septage as set forth by the Wisconsin Department of Natural Resources ("DNR"). Thereafter, KSS, and sometimes Phil's Pumping (a contractor retained by KSS), periodically spread septage on the Preislers' fields through the spring of 2008.

¶6      In 2007, Fred started noticing a decrease in his cows' milk production. Around that same time, Fred also began noticing what he believed to be an increase in the number of metabolic disorders in his cattle. Specifically, Fred noticed an increase in ketosis and milk fever among his cattle. Fred testified at trial that by 2008, "every cow that calved had milk fever" and "[a]lmost every one … then went into having ketosis." Fred further testified that those cows in 2008 "would not recover" with treatment. Fred testified that he had a total of eighty-four milking cows at the beginning of 2009 when he should have had approximately 160 to 165 milking cows. Factoring in the typical death rate and

the number of cows sold and culled, Fred estimated that sixty-seven milking cows had unexpectedly died in 2008. Fred also testified that he anticipated having 100 more nonmilking cattle than he actually had by the end of 2008. Additionally, the decrease in milk production that began in 2007 continued through 2008.

¶7     Fred's longtime veterinarian, Dr. Paul Knier, treated the Preislers' cattle in 2007 and in 2008. When Knier could not identify the cause of the cattle's health issues, Fred began seeking help from others as well. Fred worked with the University of Wisconsin Extension to test the cattle's feed, but the test revealed "nothing abnormal." Fred then hired an electrician to test for stray voltage on the farm, but those test results were negative as well. At the electrician's suggestion, Fred had the cattle's drinking water tested in August 2008. Fred obtained water samples from a faucet in his milk house—the source of the cattle's drinking water—and he sent the samples to two different labs. Those two water samples tested positive for, among other things, nitrates at a level of 20.46 parts per million ("ppm"), and 20.65 ppm, respectively.[4]

¶8     Concerned by the results, Fred began considering methods to reduce the amount of nitrates in the water. At that time, the well on the farm supplied water to both the Preislers' home and the milk house. The well had been drilled in 1972 and was only eighty-three feet deep. Fred hired a company in late August 2008 to drill a new, two-hundred-ten-foot-deep well, and the company subsequently closed off the old well. A water sample from the new well revealed less than 0.05 ppm of nitrates in the new well. Fred testified that "[t]he death rate

---

[4] The record contains references to both parts per million ("ppm") and milligrams per liter ("mg/L"). Those terms, however, are interchangeable. For simplicity, we will always refer to ppm.

[of his cattle] immediately slowed" and the other metabolic conditions declined after the cattle began drinking water from the new well.

¶9 Fred eventually began suspecting that the application of septage may have caused the increased concentration of nitrates in the Preislers' well water and that the well water, in turn, may have caused the health issues with the Preislers' cattle. Fred subsequently obtained legal counsel. At the suggestion of his attorney, Fred completed another water test in November 2008. For that test, Fred took a water sample from a water softener in the Preislers' basement that had been disconnected in May 2008, but still had water in it from that time. That sample ultimately tested positive for nitrates at a level of 46.0 ppm.

¶10 Fred also reviewed KSS's application records and its reports submitted to the DNR, and Fred compared those records to his own crop records. In his review, Fred noticed some discrepancies between KSS's records and his own. In particular, Fred determined that KSS's records did not accurately reflect where the septage was spread or the number of acres on which septage was spread. Fred found these discrepancies to be significant because DNR regulations limited the maximum application of septage to 13,000 gallons per acre in one week. *See* WIS. ADMIN. CODE § NR 113.09(5) (Oct. 2001). After considering the actual location and number of acres on which septage was spread, Fred determined that at least four times KSS and Phil's Pumping applied septage in excess of the DNR's weekly limit of 13,000 gallons per acre in a single week. Specifically, an average of 20,932 gallons per acre was spread over twenty-two acres within one week in January 2006; an average of 17,954 gallons per acre was spread over twenty-two acres within one week in October 2006; an average of 15,454 gallons per acre was spread over twenty-two acres within one week in April 2007; and an

average of 19,996 gallons per acre was spread over twenty-five acres within one week in April 2008.

¶11　The Preislers eventually commenced this action against KSS, alleging, among other things, that KSS negligently applied septage in such a manner as to cause the Preislers' loss in cattle and in milk production. The Preislers also alleged private nuisance and trespass causes of action. The Preislers later added as defendants individual members of the Kuettel family, 4 D-K Farm, Phil's Pumping, and several insurers. Most of the insurers were dismissed, however, after the circuit court concluded that there was no coverage under the relevant insurance policies. That decision was affirmed on appeal. *See **Preisler v. General Cas. Ins. Co.***, 2014 WI 135, 360 Wis. 2d 129, 857 N.W.2d 136. The Preislers later stipulated to the dismissal of Phil's Pumping and its insurers from the action.

¶12　This case subsequently proceeded to a ten-day jury trial. The jury ultimately found that Cheryl Kuettel, Dale Kuettel, Doug Kuettel, and Phil's Pumping were not negligent. The jury further found, however, that KSS, Duke, and 4 D-K Farm negligently applied septage to the Preislers' property, and that Fred was negligent in his general farming practices. The jury found that those parties' negligent actions were a cause of elevated nitrates in the Preislers' well water, and that the nitrates in the well water were a cause of damage to the Preislers. The jury apportioned the following shares of causal negligence to the parties: (1) 30% to Fred; (2) 30% to KSS; (3) 28% to Duke; and (4) 12% to 4 D-K Farm. The jury also found that the same four parties caused a private nuisance and that KSS, Duke, and 4 D-K Farm committed a trespass on the Preislers' property. In the end, the jury found that the Preislers sustained $500,000 in economic losses.

¶13　The parties filed several postverdict motions. The circuit court later issued a written decision denying the postverdict motions. The court entered judgment against KSS for $150,000 (30% of the $500,000 damage award), plus taxable costs. The Defendants now appeal, and the Preislers cross-appeal.

## DISCUSSION

### I. The Defendants' appeal

#### A. *Credible evidence supporting the jury's findings*

¶14　The Defendants do not appeal the jury's findings that they overspread septage or that they were negligent in that regard. Rather, they argue that there is no credible evidence to support the jury's findings that the Defendants' negligence caused the Preislers' damages or that the Preislers suffered $500,000 in damages. Pursuant to WIS. STAT. § 805.14(5), the Defendants ask that we reverse the judgment and order that a directed verdict be granted in their favor.

¶15　Our review of a jury's verdict is narrow, and we must sustain the verdict if the record contains "any credible evidence to support it." *Morden v. Continental AG*, 2000 WI 51, ¶38, 235 Wis. 2d 325, 611 N.W.2d 659. This standard is especially true where, in situations such as here, the circuit court "gives its explicit approval to the verdict by considering and denying postverdict motions." *D.L. Anderson's Lakeside Leisure Co. v. Anderson*, 2008 WI 126, ¶22, 314 Wis. 2d 560, 757 N.W.2d 803. In those situations, we afford special deference to the jury's determination and will not overturn the jury's verdict unless "there is such a complete failure of proof that the verdict must be based on speculation." *Id.* (citation omitted).

*1. Causation*

¶16     Consistent with the verdict form, the Defendants separate their causation argument into two parts.[5]  First, they argue the evidence was insufficient to prove that their excessive application of septage on the Preislers' property caused the elevated concentration of nitrates in the Preislers' well water.  Second, the Defendants contend the evidence was insufficient to prove that the nitrates in the well water caused any damages.  In making these arguments, the Defendants attack the sufficiency of the trial testimony provided by three of the Preislers' experts: Thomas Culp (a hydrogeologist); Dr. Knier (the Preislers' veterinarian between the early 1990s and 2010); and Dr. David Beede (a former professor of "Animal Science, Dairy Nutrition and Management").  The Defendants contend that none of these experts could testify to a reasonable degree of professional certainty regarding causation.

¶17     To establish causation, a plaintiff must prove that the defendant's negligence was a substantial factor in causing the plaintiff's harm.  ***Ehlinger v. Sipes***, 155 Wis. 2d 1, 12, 454 N.W.2d 754 (1990).  The defendant's conduct is a substantial factor in producing the harm if it leads the trier of fact, as a reasonable person, to regard it as a cause, using that word in the popular sense.  ***Id.*** Negligence and causal relations may be reasonably inferred.  ***Id.*** at 13.  In addition, more than one substantial factor may cause the plaintiff's harm in a given case.  ***Id.***

---

[5] The jury was asked two separate questions related to causation: (1) whether the negligence of any defendant was a cause of the elevated levels of nitrates in the Preislers' well water; and (2) whether the concentration of nitrates in the well was a cause of damages to the Preislers.  The jury answered "YES" to both of those questions.

¶18    When expert testimony is required to prove a claim, expert opinions expressed in terms of possibility or conjecture are insufficient. *See **Pucci v. Rausch***, 51 Wis. 2d 513, 519, 187 N.W.2d 138 (1971).  Terms such as "might," "could" or "perhaps" are not sufficient and do not reach the certitude required. *Id.* (citations omitted).  However, words such as "liable," "likely," and "probable" have been accepted as indicating a reasonable probability as opposed to a mere possibility. *Id.* (citation omitted).

¶19    The Defendants contend that Culp failed to opine, to a reasonable degree of certainty, that the excessive application of septage to the Preislers' fields caused the nitrates in the Preislers' well water in 2008.  In particular, the Defendants argue that Culp could not opine that any nitrogen from the excess septage reached the underground aquifer or the Preislers' well water.  In support of their contention, they highlight several of Culp's concessions, including: (1) he did not know the nitrogen content of the septage or manure placed on the land; (2) he did not calculate the amount of nitrogen that would have gone into the soil as a result of the excess septage as compared to the amount resulting from Preislers' other fertilizing practices; (3) he did not calculate the percentage of nitrates from the septage that crops would have removed from the soil; and (4) he did not have an opinion as to the time it would take nitrates on the soil surface to reach the underground aquifer.  The Defendants further contend that the Preislers offered no evidence regarding the nitrogen level in the groundwater before septage was applied or after the application of septage stopped.

¶20    We reject the Defendants' arguments.  Culp's testimony was sufficient for the jury to find that KSS's excessive application of septage to the Preislers' property was a substantial factor in causing the elevated concentration of nitrates in the Preislers' well water.  Culp testified at trial that septage is a source

of nitrates and that, in his professional opinion, "[l]and application practices of septage by [KSS] *likely caused* high concentrations of nitrates in the Preisler groundwater supply well." (Emphasis added.) Culp's use of the words "likely caused" demonstrated the necessary certitude required of an expert opinion. *See Pucci*, 51 Wis. 2d at 519.

¶21     Although the Defendants suggest that Culp's opinion is unsupported by any factual evidence, the record belies that assertion. Culp relied on a number of sources to reach his ultimate opinion, including the type of soil on the Preislers' property, topographic maps of the property, published documents and data, aerial photographs, documents produced during litigation, DNR permits, and records detailing the application of septage to the Preislers' property. Specifically, Culp testified that the subsurface conditions on the Preislers' property were "vulnerable to groundwater contamination" due to thin "overlying soils" and the existence of a "karst aquifer," which generally allows groundwater to move faster than it would in circumstances where a karst aquifer is not present. Culp further described, using a topographic map, the directions groundwater flowed under the Preislers' property, opining that the groundwater underneath Field 9A (a field where septage was overspread) would flow southwest toward the Preislers' well. Culp testified that it would have taken between 35 and 600 days for the groundwater to flow from the site of septage application to the Preislers' well. In all, Culp established a sufficient factual basis for his opinion regarding causation.

¶22     Culp's concessions at trial did not prevent him from reasonably reaching his ultimate opinion, nor do they render his testimony speculative. To be sure, Culp did agree with the Defendants' counsel that he was not "offering [an] opinion as to what nitrogen, if any, from the septage reached the aquifer … between 2005 and 2008." But this concession is remarkably different from the

Defendants' argument that Culp "explicitly admitted he cannot opine to a reasonable degree of certainty that any nitrogen from the excess septage even reached the groundwater." Culp never made such an admission. Instead, Culp simply agreed that he was not opining specifically *what* nitrogen from the applications of septage reached the Preislers' well water. When considering this concession and each of Culp's other concessions identified by the Defendants, we conclude that they ultimately go to the weight of Culp's testimony and not to its admissibility or sufficiency under our legal standards. *See Tony Spychalla Farms, Inc. v. Hopkins Agric. Chem. Co.*, 151 Wis. 2d 431, 441, 444 N.W.2d 743 (Ct. App. 1989) (recognizing that a fact finder has the duty to evaluate the credibility, sufficiency and weight of the expert testimony). As we explained, there was a sufficient factual basis for Culp's opinion.

¶23 The Preislers were not required to provide an expert opinion as to the exact causes of the high concentration of nitrates in the well water. Rather, the Preislers only needed to show that the excessive application of septage was "a substantial factor" in causing the concentration of nitrates in the well water. *See Ehlinger*, 155 Wis. 2d at 12. Culp's testimony was sufficient to meet that standard.

¶24 The Defendants contend that *Kinnick v. Schierl, Inc.*, 197 Wis. 2d 855, 541 N.W.2d 803 (Ct. App. 1995), is instructive. In that case, no party to the litigation had an expert witness who would testify "to a reasonable degree of probability, *or even to a likelihood*, that contaminants migrated from [one] property to the plaintiffs' properties." *Id.* at 861 (emphasis added). This court recognized that expert testimony was required to prove the claim at issue, and we therefore concluded that the evidence was insufficient to support the claim. *Id.* at 862. Here, however, the Preislers provided the necessary expert testimony

12

because Culp testified that KSS's application of septage "*likely caused* high concentrations of nitrates in the Preisler groundwater supply well." (Emphasis added.)

¶25 The Defendants next argue that the Preislers failed to prove that nitrates in the well water caused the Preislers any damages. Specifically, the Defendants contend that the evidence was insufficient to show that the nitrates in the well water negatively impacted the Preislers' cattle's health or milk production. The Defendants point out that Dr. Knier admitted he could not opine that nitrates in the Preislers' well water caused an increase in metabolic disorders or an increase in cattle deaths. The Defendants further contend that Knier could only identify "possible" causes of metabolic disorders in cows, including improper diets, the positioning of cows in stalls, and elevated nitrates in water. The Defendants also criticize Knier's failure to "evaluate the rations the Preislers fed to their cattle" despite his admission that most metabolic disorders in cattle are related to their diets.

¶26 The Defendants further argue that Dr. Beede made a "fatal" concession to the Preislers' causation claim when he admitted that he could not "state to a reasonable degree of scientific certainty that the application of septage from 2005 to 2009 on [the Preislers'] farm was a substantial factor in causing the metabolic diseases described on [the Preislers'] farm." The Defendants also highlight Beede's concessions that: (1) he did not have any information regarding the rate of metabolic disease in the Preislers' cattle before 2006 or after 2009; (2) there is no scientific evidence showing "a significant increase in metabolic disorders in the cattle herd['s drinking water containing nitrates] at levels of 46 [ppm]"; (3) he did not review any analysis regarding the cattle's feed despite admitting that issues with feed can cause metabolic disorders in cattle; (4) he

13

assumed the Preislers' cattle consumed water containing 20-46 ppm of nitrates "over a long period of time" even though "a long period of time" has never been defined; (5) he had to "assume quite a bit of information" to reach his conclusions; and (6) he had no opinion about the cause of the cattle's deaths.

¶27 The Preislers argue—and we agree—that there was credible evidence to support the jury's finding that nitrates in the water caused damage to the Preislers. Doctor Beede testified at trial that

> with prolonged consumption of nitrates from water (such as 20 to greater than 40 parts per million) a subacute condition presents in which cattle are chronically affected. The accumulative effects of prolonged nitrate consumption in drinking water *most probably complicate* and are associated with other health and metabolic problems such as displaced abomasums, ketosis, fatty liver, poor feed intake and milk production.

(Emphasis added.) Beede further testified that, in his expert opinion, "nitrates in the drinking water of the Preislers' dairy cattle *most probably caused* … chronic subacute exposure and abnormal health, eventually becoming acute (nitrate toxicity) as an accumulative effect that was further exacerbated by other routine biological challenges." (Emphasis added.) Like Culp's opinion, Beede's opinions met the level of certitude required of an expert opinion, *see Pucci*, 51 Wis. 2d at 519, and the alleged deficiencies the Defendants identify go to the weight, not the admissibility or legal sufficiency, of his opinions.

¶28 Doctor Beede's opinions were further supported by his testimony that displaced abomasums and ketosis "could occur at a greater incidence" in cattle with subclinical nitrate toxicity than in cattle that did not have that chronic condition. He also testified that a National Research Council publication in 1974 found that "a nitrate[s] concentration between 20 to 40 [ppm] could be harmful to

14

dairy cattle if consumed over a long period of time," and that "concentrations of 40 to 100 [ppm] put dairy cattle at risk of possible death." Again, the Preislers presented evidence that the concentration of nitrates in their well water was approximately 46.0 ppm in May 2008 and 20.5 ppm in August 2008.

¶29 In addition to Dr. Beede's testimony, Dr. Knier testified that although the Preislers' cattle were generally healthy before 2007, something was "amiss" with the cattle's health after 2007. He testified that the cattle in 2007 and in 2008 "did not respond the way most cows respond … after displaced abomasal surgery. Cows, as far as being treated for milk fever, did not get up and/or did poorly or died." Knier testified that his veterinarian visits to the Preislers' farm increased from thirty-five times in 2006, to forty-five times in 2007, to fifty-eight times in 2008, and then back down to twenty-seven times in 2009. The increase in 2007 and 2008 did not include treatment that Fred provided himself before calling Knier. Fred testified that he "begin[s] treatment on most health items." Knier also testified that the death rate of the Preislers' cattle was "somewhat risen in 2007" and "extremely critical in the late summer of 2008 to fall of 2008." Knier further testified that high levels of nitrates in cattle's diet can cause the cattle to "be off feed" and can cause other health issues, such as ketosis, a retained placenta after calving, and methemoglobinemia.

¶30 Fred's testimony, albeit lay testimony, provided additional context and support for the issue of causation. Fred testified that he began noticing a decrease in his cows' milk production in 2007, which decreased even further in 2008. Fred also noticed an increase in the number of metabolic disorders in his cattle in 2007 and 2008, including an increase in ketosis and milk fever. He further testified that he had only eighty-four milking cows at the end of 2008 despite his expectation of having 160 to 165. Fred estimated that approximately

sixty-seven milking cows and roughly 100 nonmilking cattle had died in 2008, well above typical death rates. Fred rejected the suggestion that his cattle's feed was a cause of the cattle's health issues, testifying that he worked with a nutritionist, that the feed was routinely sampled and its composition remained about the same, and that the University of Wisconsin Extension found "nothing abnormal" about the feed. Notably, Fred testified that "[t]he death rate [of his cattle] immediately slowed," and the other metabolic health problems declined, after the cattle began drinking water from the newly installed well in 2008.

¶31 The Defendants overstate the significance of Dr. Beede's "fatal" concession. Beede specifically conceded that he could not opine to a reasonable degree of scientific certainty that "the *application of septage* from 2005 to 2009" was a substantial factor in causing metabolic diseases in the Preislers' herd. (Emphasis added.) Beede's ultimate opinion, however, was that the "*nitrates in the drinking water* of the Preislers' dairy cattle most probably caused … chronic subacute exposure and abnormal health, eventually becoming acute (nitrate toxicity) as an accumulative effect." (Emphasis added.) In other words, Beede conceded that he could not draw his opinion back to the application of septage, but he could opine that the nitrates in the drinking water "most probably caused" chronic subacute exposure and abnormal health.

¶32 Beede's testimony addressed precisely what the jury was asked to determine. The jury was specifically asked on the verdict form whether "the nitrate levels in the well [were] a cause of damages to the Preislers." Moreover, as we have already discussed, Culp's opinion was sufficient to show that the excessive application of septage caused the concentration of nitrates in the well water. Accordingly, Beede did not need to provide an opinion that connected the

Preislers' damages to the Defendants' application of septage, much less one "to a reasonable degree of scientific certainty."

¶33  In addition, Dr. Beede's other concessions do not defeat his opinion testimony.  Beede conceded that he lacked information regarding the incidence of metabolic disorders before 2006 and after 2009; that he was not aware of any scientific evidence showing "a significant increase" in metabolic disorders in cattle that consumed water containing 46 ppm of nitrates; that he did not review any analysis of the Preislers' feed; and that he could not define "a long period of time" for purposes of exposure to high levels of nitrates.  Nonetheless, those concessions go to the weight of Beede's testimony and not its admissibility or legal sufficiency.  *See Tony Spychalla Farms*, 151 Wis. 2d at 441.  Moreover, even though Beede conceded that he had to "assume quite a bit of information," that concession only occurred in response to questions regarding whether Beede's opinions in this case, when subjected to peer review, would be capable of being published.

¶34  The Defendants correctly observe that both Drs. Beede and Knier testified that they were not offering an opinion as to whether the high levels of nitrates in the well water caused the Preislers' cattle to die at higher rates in 2008. Regardless of these concessions, however, there was still credible evidence for the jury to find that the concentration of nitrates in the well water caused increased metabolic disorders and decreased milk production in the Preislers' cattle.

¶35  To summarize, there was credible evidence to support the jury's findings that the Defendants' negligence was a cause of the elevated nitrates concentration in the Preislers' well water and that the nitrates were a cause of damage to the Preislers.  Again, Culp testified that the Defendants' application of

septage "likely caused high concentrations of nitrates in the Preisler groundwater supply well." In addition, Dr. Beede testified that the nitrates in the water "most probably caused" the cattle's abnormal health issues and that the effects of prolonged nitrates consumption in drinking water "most probably complicate and are associated with other health and metabolic problems such as … milk production."

## 2. *Damages*

¶36 The Defendants next argue that the evidence was insufficient to support the jury's finding of damages because there was no credible evidence that the consumption of nitrates caused the increase in metabolic disorders or death in the cattle. The Defendants contend that the Preislers' damages expert, Dr. Logan Kelly, relied solely on the reports of Dr. Knier and Dr. Beede, who "could not opine to a reasonable degree of certainty that any cattle actually died as a result of nitrates." The Defendants further argue that although Kelly testified that his lost profit calculation did not depend on the number of cattle that had died, it did depend on the number of milking cows that should have been in the herd, which the Defendants argue "necessarily accounts for the presumed loss of cattle, at least in part."

¶37 To support a damage award, the evidence must demonstrate that the injured party has sustained some injury and establish sufficient data from which the fact finder could properly estimate the amount of damages. *Plywood Oshkosh, Inc. v. Van's Realty & Constr., Inc.*, 80 Wis. 2d 26, 31, 257 N.W.2d 847 (1977). A party need not prove damages "with mathematical accuracy," but the party must produce sufficient evidence to allow a fact finder to estimate damages with a reasonable degree of certainty. *Id.*

¶38　Doctor Kelly testified that the Preislers suffered a total loss of approximately $1.8 million (roughly $1.67 million for diminished milk production and $130,000 for diminished value of the herd). In calculating that figure, Kelly relied on the opinions of Dr. Beede and Dr. Knier that there was, in fact, damage to the Preislers' cattle. As discussed earlier, Beede's opinions satisfied the necessary certitude required for an expert opinion, and his testimony was further supported by Knier's and Fred's testimony. Kelly could therefore rely on Beede's opinion that the nitrates in the well water caused the cattle's metabolic disorders and diminished milk production.

¶39　The Defendants correctly observe that Dr. Kelly's calculations were premised—"at least in part"—on the improper belief that the Preislers lost cattle due to nitrates in the well water. Kelly testified that his calculations were based, in part, on "the number of cows that should have been in the [Preislers'] herd." However, because neither Dr. Beede nor Dr. Knier provided an expert opinion that the nitrates in the well water caused the Preislers' cattle to die, Kelly's calculations improperly included some lost profits for cattle that the Preislers "should have" had.

¶40　Even with this flaw in Dr. Kelly's opinion, there is still credible evidence to support the $500,000 award for economic losses. Kelly's calculation of lost profits (totaling $1,669,797.34) also accounted for the diminished milk production of the Preislers' actual cattle—i.e., the diminished milk production of the cattle that *were still alive* in the Preislers' herd. Kelly testified that the Preislers' average monthly production per cow showed a "significant negative trend" between 2008 and 2012. Indeed, Kelly's assessment was consistent with the chart showing the "Annualized Production per Cow." That chart also showed that although the Preislers' cattle were able to exceed the expected normal

production in 2007, production per cow generally declined from that time through 2012—fluctuating between roughly ninety percent of the expected production all the way down to less than approximately fifty percent of the expected production.[6]

¶41    Likewise, Dr. Kelly's calculation for the loss in value of the herd (totaling $133,351.20) included cows that "should have been" in the herd, but it also accounted for the loss in value of the cattle that the Preislers did, in fact, still have.   Kelly explained that the Preislers' herd had a "significant history" of underproduction at the end of 2012, which would make the cattle "harder to market."   Kelly testified that the 120 cows that the Preislers owned in December 2012 had a salvage value of approximately $801.24 each, but they "should have been valued at $1530 apiece."   Without considering the cattle that Kelly believed the Preislers should have had, Kelly's testimony still supports, roughly, at least $87,000 in damages for the loss in value for the Preislers' herd.

¶42    In light of all of the evidence, the jury made a significant departure from Dr. Kelly's overall opinion that the Preislers suffered $1,803,148 in damages as a result of the Defendants' negligence.  By awarding only $500,000, the jury must have determined that Kelly's total economic loss calculation was not appropriate based on the facts presented at trial, which is consistent with the

---

[6] Doctor Kelly estimated that the Preislers' expected normal production would have been roughly 23,000 pounds of milk per cow per year, which was in the eightieth percentile for milk production in Minnesota and Wisconsin.  The Defendants seem to question whether Kelly had any basis for making this estimate.  But Kelly's estimate was supported by the record.  Kelly testified that the Preislers' farm would have been in the eightieth percentile because Dr. Knier described the Preislers' farm as a "B or B-plus" farm and because the Preislers' cattle exceeded the 23,000 pound mark in 2007.  In addition, the Defendants' expert, Dr. Terry Smith, largely confirmed that the Preislers were close to the top twenty percent of farms, testifying that the Preislers' milk production per cow would "be close to the top 20 percent, but they're not in the top 20 percent."

Defendants' argument here. Nonetheless, the jury could have relied on portions of Kelly's testimony to find that the Preislers still suffered significant damages in decreased milk production and in the decreased value of their herd. The jury could have also found that the Preislers suffered damages as a result of having to install a new well and having to treat their cows more often.

¶43      In all, we conclude there was credible evidence to support the jury's damages finding of $500,000. Accordingly, as to both causation and damages issues, the circuit court did not err in denying the Defendants' motion for a directed verdict.

B. *The weight of the evidence supporting the jury's verdict*

¶44      In the alternative, the Defendants argue, pursuant to WIS. STAT. § 805.15(1), that the judgment should be reversed and the cause remanded for a new trial on the negligence, nuisance and trespass claims and on the issue of damages. The Defendants contend that the jury's verdict is contrary to the great weight and clear preponderance of the evidence. Similar to the Defendants' sufficiency-of-the-evidence arguments, they again focus on issues of causation and damages.[7]

¶45      A new trial may be granted in the interest of justice when the jury's findings are contrary to the great weight and clear preponderance of the evidence, even though the findings are supported by credible evidence. *Krolikowski v.*

---

[7] The Defendants do not advance any separate argument regarding the Preislers' private nuisance or trespass claims aside from their argument that the jury's causation findings are contrary to the great weight and clear preponderance of the evidence. Pursuant to the verdict form, if the jury answered "no" to either of the causation questions regarding the Defendants' negligence, the jury was not required to address the private nuisance or trespass claims.

*Chicago & Nw. Transp. Co.*, 89 Wis. 2d 573, 580, 278 N.W.2d 865 (1979). We owe great deference to a circuit court's decision denying a new trial, and we will not disturb that decision absent an erroneous exercise of discretion. *Kubichek v. Kotecki*, 2011 WI App 32, ¶29, 332 Wis. 2d 522, 796 N.W.2d 858.

¶46 The Defendants contend that they offered extensive evidence showing that any excess septage spread on the Preislers' fields did not cause an elevated concentration of nitrates in the Preislers' well. They contend that their soil expert, Dr. Wolkowski, opined that the excessive application of septage between 2005 and 2008 did not impact the nitrates content of the well water; that the concentration of nitrates was likely the result of long-term application of fertilizer and other nitrogen-containing materials; and that the amount of septage spread, especially when considering only the amount in excess of the allowable limits, accounted for a relatively small portion of nitrogen applied to the land. The Defendants also point out that soil tests from before KSS applied septage to the Preislers' property showed high levels of phosphorus and potassium, which Wolkowski testified "means there was manure applied at higher rates than had been suggested."

¶47 Even when considering the perceived deficiencies in the Preislers' case, the evidence at trial does not support overturning the jury's finding that the Defendants' negligent application of septage was a cause of elevated nitrates in the Preislers' well water. Again, Culp testified—with the necessary certainty—that "[l]and application practices of septage by [KSS] likely caused high concentrations of nitrates in the Preisler groundwater supply well."

¶48 Furthermore, Dr. Wolkowski's testimony had its own shortcomings. Wolkowski admitted that he did not know the Preislers rented an additional 108

acres of farm land. If the jury believed Fred's testimony that he applied manure "at an even rate on each field" and if the jury interpreted that testimony as meaning that it related to both Fred's own fields and the fields he rented, that fact would undercut Wolkowski's calculation regarding the amount of nitrogen applied to the Preislers' land. Wolkowski's opinion was also based on his calculation of the Preislers' herd size, which allowed Wolkowski to estimate the amount of manure produced on the Preislers' farm. If the jury rejected or questioned these calculations, Wolkowski's calculation regarding the amount of nitrogen applied to the Preislers' property would have been undercut yet again.

¶49     The Defendants also argue that they demonstrated that the nitrates found in the Preislers' well water did not cause any harm to the Preislers. In doing so, the Defendants rely heavily on the testimony of Dr. Steven Ensley, a veterinary toxicologist. Ensley testified that the concentration of nitrates in the Preislers' well water was not high enough either to kill the Preislers' cattle or to cause any metabolic disorders. Ensley further opined that livestock could safely drink water containing nitrates at levels up to 100 ppm—more than twice the amount found in the Preislers' well water. Ensley testified that he studied the effects of drinking water on livestock for his doctoral dissertation and found no correlation between high levels of nitrates and metabolic disorders or milk production.

¶50     This evidence does not warrant disturbing the jury's finding that the concentration of nitrates in the Preislers' well water was a cause of the Preislers' damages. As discussed earlier, Dr. Beede testified that the nitrates in the water "most probably caused" the cattle's abnormal health issues and that the effects of prolonged nitrates consumption in drinking water "most probably complicate and are associated with other health and metabolic problems such as … milk production." Beede's testimony was further buttressed by Fred's testimony that

23

his cattle experienced higher rates of metabolic disorders, that his cattle's milk production decreased, and that the metabolic disorders decreased after the new well was installed. Moreover, Dr. Ensley conceded that other literature—literature with which he did not agree—has found a correlation between nitrates in water and metabolic disorders. The jury could therefore choose to reject Ensley's opinion and give more weight to Beede's testimony.

¶51 The Defendants lastly argue that the damages award was contrary to the great weight of the evidence. The Defendants first point to the testimony of Dr. Terry Smith, an agricultural economist. Smith testified that the Preislers' financial records showed "significant losses prior to this alleged incident" and "somewhat stagnant … output." He also testified that the Preislers' milk sales correlated with other trends in the dairy industry during the years at issue and that the Preislers' financial records did not indicate a loss of sixty-seven milking cows. As compared to other farms in the Midwest, Smith testified that the Preislers' milk production per cow would "be close to the top 20 percent, but they're not in the top 20 percent." Smith also testified that the net profit per cow at dairy farms across the country since 2005 has been roughly $200 to $400 per year.

¶52 The Defendants also emphasize evidence that contradicted Fred's testimony that approximately sixty-seven milking cows and 100 nonmilking cattle died in 2008. In particular, they observe that the owner of the company that had removed dead cattle from the Preislers' farm testified that he did not recall, and his records did not reflect, picking up 167 cattle in 2008. Similarly, Dr. Knier testified that Fred said he "had significant [cattle] losses but not to [the level of 167 deaths]."

¶53    The evidence highlighted by the Defendants does not support setting aside the jury's damage award. Doctor Smith's testimony does suggest that the Preislers were experiencing financial difficulties during the time in question. Still, the jury could credit portions of Dr. Kelly's testimony regarding lost profits over Smith's testimony regarding the same. Moreover, although Kelly's opinion improperly accounted for cattle that the Preislers should have had, as discussed above, his testimony still provided a sufficient basis for the jury to award a total of $500,000 in economic losses. On balance, we cannot conclude that the Defendants' evidence regarding damages greatly outweighed that of the Preislers.

¶54    In short, the jury's findings regarding causation and damages were not against the great weight and clear preponderance of the evidence. Accordingly, the circuit court did not err by denying the Defendants' motion for a new trial.

## II. The Preislers' cross-appeal

### A. Concerted action theory of liability

¶55    The parties stipulated before closing arguments that the circuit court could decide after the jury verdict whether the Defendants[8] were engaged in a concerted action. Accordingly, the Preislers filed a postverdict motion asking the court to find that the Defendants were engaged in a concerted action under WIS.

---

[8] For simplicity and ease of reading, we will continue to refer to Duke, KSS, and 4 D-K Farm as "the Defendants." Although Dale, Doug and Cheryl join the Defendants' arguments here as cross-respondents to the Preislers' cross-appeal, the Preislers' cross-appeal does not raise any issues related to them specifically.

STAT. § 895.045(2).[9] The court subsequently determined that the Preislers failed to establish a concerted action because they "offered no evidence at trial that KSS, Duke, and 4 D-K Farm acted in furtherance of a common plan to commit a tortious act, i.e., to overspread septage."

¶56 The Preislers argue the circuit court erred by determining that the Defendants did not engage in a concerted action. The Preislers contend that Duke orchestrated a plan to dispose of septage on the Preislers' property "in utter disregard of DNR regulations." The Preislers further emphasize that Duke was responsible for managing KSS and 4 D-K Farm and that both businesses therefore shared Duke's disregard for the amount of septage spread on the Preislers' property.

¶57 In response, the Defendants contend that the Preislers' concerted action theory fails because they did not prove that the Defendants "acted pursuant to a common scheme or plan to commit a tortious act." In particular, the Defendants contend that the Preislers "did not prove that those three defendants acted pursuant to a common plan to over-spread septage in violation of [the] law." The Defendants further argue that similar ownership and management between KSS and 4 D-K Farm was insufficient to support a finding of a concerted action.

¶58 WISCONSIN STAT. § 895.045(2) "is the codification of the concerted action theory of liability." *Richards v. Badger Mut. Ins. Co.*, 2008 WI 52, ¶46,

---

[9] The Preislers alternatively argued in their postverdict motion that Duke's liability is attributable to 4 D-K Farm and KSS by piercing the corporate veil "in reverse" or under the doctrine of respondeat superior. The Preislers do not raise those arguments on appeal, and we therefore do not address them further. *See A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998).

309 Wis. 2d 541, 749 N.W.2d 581. The statute provides that if two or more parties "act in accordance with a common scheme or plan, those parties are jointly and severally liable for all damages resulting from that action, except as provided in [WIS. STAT. §] 895.043(5)." Sec. 895.045(2). Three elements are required to establish a concerted action under § 895.045(2): (1) "there must be an explicit or tacit agreement among the parties to act in accordance with a mutually agreed upon scheme or plan"; (2) "there must be mutual acts committed in furtherance of that common scheme or plan that are tortious acts"; and (3) "the tortious acts that are undertaken to accomplish the common scheme or plan must be the acts that result in damages." *Richards*, 309 Wis. 2d 541, ¶50. The application of § 895.045(2) to undisputed facts is a question of law that we review do novo. *See Richards*, 309 Wis. 2d 541, ¶14.

¶59 The Preislers failed to prove that the Defendants agreed, either explicitly or tacitly, to act in accordance with a mutually agreed upon scheme or plan to overspread septage. *See id.*, ¶¶35, 50. Specifically, the evidence at trial was insufficient to show anything more than "parallel action" between the Defendants, which "is insufficient to show a common scheme or plan." *See id.*, ¶50. The Preislers presented evidence that 4 D-K Farm stored the septage and provided the necessary equipment to spread the septage on the Preislers' farm. The Preislers also showed that Duke, in his managerial capacity of KSS, decided "when, where and how much septage is applied to various fields by [KSS]." None of this evidence, however, establishes that the Defendants tacitly or explicitly agreed to any plan or scheme to *overspread* septage on the Preislers' fields.

¶60 Contrary to the Preislers' arguments, Duke's ownership and management of KSS and 4 D-K Farm are insufficient to establish an agreement between him and the businesses to carry out a common scheme or plan to

27

overspread septage. The Preislers do not dispute that KSS and 4 D-K Farm are separate and distinct legal entities. Further, Doug and Dale—the other owners of both KSS and 4 D-K Farm—were not found negligent in this case. Duke testified at trial that Doug and Dale, as owners of KSS and 4 D-K Farm, each had input in the management and operation of the business enterprise, and the two brothers consulted with Duke regarding the businesses on a daily basis. These meetings between the brothers included discussions regarding the application of septage. Because Doug and Dale were involved in the management and operation of KSS and 4 D-K Farm, the jury's finding of no negligence on the part of Doug and Dale reinforces the conclusion that no tacit or explicit agreement to overspread septage existed between any of the Defendants.

¶61    The jury also found that Duke did not "make a statement to Fred Preisler that was untrue, deceptive, or misleading at the time it was made with the intent to induce the spreading of septage on the Preisler property." Fred testified that before he consented to septage being spread on his property, Duke assured him that the DNR's regulations would be followed. The jury's finding that this statement was not untrue, deceptive or misleading supports the conclusion that Duke did not have any plan or scheme—at least in 2002 or 2003—to overspread septage when he obtained Fred's permission to spread septage on the Preislers' property.

¶62    Finally, as the circuit court aptly observed, the jury's finding that the Defendants were causally negligent is insufficient, alone, to establish concerted action liability. *See* ***Richards***, 309 Wis. 2d 541, ¶49 ("Something more than causal negligence is required."). Thus, a concerted action was not established merely from the jury attributing 30% causal negligence to KSS, 28% causal negligence to Duke, and 12% causal negligence to 4 D-K Farm.

28

*B. The admissibility of Dr. Wolkowski's opinion testimony*

¶63     The Preislers next argue that the circuit court erred by denying their postverdict motion to strike Dr. Wolkowski's opinion testimony regarding the cause of nitrates in the Preislers' well water.  The Preislers had also objected to that testimony before and during trial, but the court overruled those objections.  At trial, Wolkowski testified that he believed the application of septage "did not impact the nitrate[s] content of the [Preislers'] well [water]."  He further testified that he believed nitrates in the Preislers' well water were present before 2005 because of "[l]ong-term applications of fertilizer or other nitrogen-containing materials."   The court denied the Preislers' postverdict motion to strike Wolkowski's testimony, concluding Wolkowski's opinions were not speculative.

¶64     We review a circuit court's decision to admit or exclude expert testimony for an erroneous exercise of discretion.  *State v. Giese*, 2014 WI App 92, ¶16, 356 Wis. 2d 796, 854 N.W.2d 687.  A circuit court's discretionary decision will not be reversed if it has a rational basis and was made in accordance with accepted legal standards in view of the facts in the record.  *Id.*  We may also search the record for reasons to sustain the circuit court's exercise of discretion. *Dakter v. Cavallino*, 2014 WI App 112, ¶68, 358 Wis. 2d 434, 856 N.W.2d 523.

¶65     On appeal, the Preislers contend that "Dr. Wolkowski's opinions were based on multiple false assumptions."  In particular, the Preislers assert that Wolkowski improperly assumed: (1) that Fred spread eighty-five percent of his cattle's manure on the fields closest to the Preislers' home and barn; (2) that the Preislers had approximately 200 animals in their herd; (3) that Fred spread 20,000 pounds of manure on each acre of land despite Fred's testimony that he only spread 15,000 pounds per acre; and (4) that the KSS records accurately portrayed

the amount and location of septage spread on the Preislers' land. The Preislers also argue that Wolkowski's testimony was deficient because he lacked knowledge regarding the herd's health before 2008, the other farm land that Fred had rented, the historical use of the Preislers' land before 1990, and the directional flow of subsurface water beneath the Preislers' land.[10]

¶66    We reject the Preislers' arguments. In addition to evaluating the credibility, sufficiency and weight of the expert testimony, a fact finder has the duty to determine whether the facts underlying an expert opinion are in fact true. *See Tony Spychalla Farms*, 151 Wis. 2d at 441. Doctor Wolkowski was entitled to base his opinions and inferences on the facts and data in this case, *see* WIS. STAT. § 907.03 (2009-10), including facts and data that the Preislers disputed. The Preislers may question the accuracy of KSS's application records, but it was the jury's responsibility to determine whether those records were accurate, and, in turn, whether Wolkowski's testimony and opinion was based on accurate data.

¶67    Likewise, it was the jury's responsibility to determine the sufficiency and credibility of Dr. Wolkowski's calculations regarding the number of cattle on the Preislers' farm and the amount of manure spread per acre. Wolkowski testified that he was unable to review any records detailing where the

---

[10] The parties disagree over whether the admissibility of Dr. Wolkowski's testimony was governed by the current version of Wisconsin's expert witness statute, WIS. STAT. § 907.02, which employs the federal standard for expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See State v. Alger*, 2013 WI App 148, ¶3, 352 Wis. 2d 145, 841 N.W.2d 329, *aff'd* 2015 WI 3, 360 Wis. 2d 193, 858 N.W.2d 346. We have previously recognized that the current version of § 907.02(1) only applies to actions or special proceedings commenced on or after February 1, 2011. *See Alger*, 352 Wis. 2d 145, ¶¶11-12. Because this action was commenced on December 30, 2010, the current version of § 907.02(1) does not govern Wolkowski's testimony. The applicability of the current version of § 907.02(1), however, does not affect our analysis here. As both parties recognize, the Preislers' arguments primarily rely on cases decided before the legislature amended § 907.02 in 2011.

Preislers spread manure on their land. In order to determine the amount of manure spread on the land, Wolkowski had to first determine how many cows were in the Preislers' herd. Wolkowski calculated that number by extrapolating from two known data points: the number of cattle in 2003 and the number of cattle in 2008. As detailed in Wolkowski's report, those data points were not based on Wolkowski's speculation or conjecture but were instead based on Fred's deposition testimony.

¶68    Doctor Wolkowski then used his calculation of the number of cattle to determine the total amount of manure produced by the herd. Wolkowski estimated—based on rates provided by the National Resource Conservation Service—that the Preislers' herd produced approximately 3,000 to 3,500 tons of manure each year. Wolkowski further testified that he disagreed with Fred's estimate that Fred was spreading approximately 15,000 pounds of manure per acre each year. Wolkowski explained that he expected that number to be "higher" based on his experience with the "box-type" manure spreader that Fred used. Wolkowski's testimony was therefore based on his experience "calibrating those types of spreaders" and not based on speculation or conjecture. Moreover, Wolkowski testified that he did not believe the excessive application of septage would be a substantial factor in causing excess nitrogen, even assuming that Fred spread 18,000 pounds of manure per acre.[11]

¶69    Doctor Wolkowski could also infer, based on his experience, that the Preislers would apply approximately eighty-five percent of their cattle's manure to

---

[11] Although Fred originally testified that his goal was to spread 15,000 pounds of manure per acre, he later testified that his objective was to spread the "[t]hree loads an acre at 6,000 pounds [per load]."

the fields closest to their home. As Wolkowski noted in his report and later reaffirmed at trial, "[t]hese fields are closer and more convenient to treat, and most farmers recognize some value for manure and are reluctant to apply it on rented land." Wolkowski's testimony was again based on his experience.

¶70 In addition, Dr. Wolkowski's lack of knowledge regarding certain facts does not render his opinions inadmissible. Wolkowski conceded on cross-examination that he lacked "specific" knowledge regarding the health issues in the Preislers' herd before 2008; that he did not have any information regarding the dairy operations that occurred on the Preislers' property before the 1990s; that he did not know the Preislers rented other farm land; and that he did not know whether the nitrates from the manure would "flow" in the direction of the Preislers' well. Although these concessions might have undermined Wolkowski's credibility and might have further supported the Preislers' arguments, they did not render Wolkowski's opinions speculative or based on conjecture. Ultimately, the jury was responsible for evaluating these concessions in the context of other evidence and for determining the credibility and weight of Wolkowski's testimony.

¶71 Any deficiencies in Dr. Wolkowski's testimony go to the weight of his testimony and not to the admissibility his testimony. Accordingly, the circuit court did not erroneously exercise its discretion by refusing to strike Wolkowski's opinion testimony.

## C. Fred Preisler's negligence

¶72    Finally, the Preislers contest the jury's finding that Fred was causally negligent, and they seek to modify the jury's verdict to reflect that Fred was not negligent.  The Preislers first contend that Fred was not negligent, as a matter of law, because he had no duty of care under the circumstances.  In the alternative, the Preislers argue that the record contains no credible evidence that Fred was causally negligent.

¶73    In Wisconsin, everyone has a duty to exercise ordinary care under the circumstances.  *Hoida, Inc. v. M&I Midstate Bank*, 2006 WI 69, ¶30, 291 Wis. 2d 283, 717 N.W.2d 17.  If a person, without intending to do harm, acts or fails to do an act that a reasonable person would recognize as creating an unreasonable risk of injury or damage to a person or property, he or she is not exercising ordinary care under the circumstances, and is therefore negligent.  *Id.* Whether a duty of care exists is a question of law that we review de novo. *Stephenson v. Universal Metrics*, 2002 WI 30, ¶15, 251 Wis. 2d 171, 641 N.W.2d 158.  Moreover, our review of a jury's verdict is narrow, and we must sustain the verdict if the record contains "any credible evidence to support it."  *Morden*, 235 Wis. 2d 325, ¶38.

¶74    Fred plainly had a duty of care to refrain from spreading manure and other fertilizers in a manner that a reasonable person under the circumstances would recognize as creating an unreasonable risk of injury or damage to a person or property—especially to one's own property.  *See **Hoida***, 291 Wis. 2d 283, ¶30. Although the Preislers contend that "[t]he spreading of cow manure by dairy farmers is a matter of necessity and is beneficial for the growth of crops," they do not dispute that an unreasonable amount of manure and other fertilizers spread on

land could foreseeably cause harm to a person or property. The Preislers instead argue that Fred followed a nutrient management plan when applying manure and other fertilizers and that "his conduct was eminently reasonable." Ultimately, the Preislers' reasonableness argument is not an argument against the existence of a duty but an argument that Fred did not breach his duty of care. As we discuss below, credible evidence supported the jury's finding that Fred breached his duty of care.

¶75 The Preislers' arguments regarding Fred's negligence are largely premised on their argument that Dr. Wolkowski's opinion testimony was inadmissible. But, as we have already explained, the circuit court did not erroneously exercise its discretion by refusing to strike Wolkowski's testimony. We can therefore consider Wolkowski's testimony when determining whether credible evidence existed to support the jury's findings regarding Fred's negligence.

¶76 Both Dr. Wolkowski's testimony and Fred's testimony support the jury's finding that Fred's farming practices, including his application of manure and other fertilizers to his land, breached his duty of care. Fred testified that he applied both manure and fertilizer to his fields, and he acknowledged that the application of manure is regulated by the DNR. He also testified that he authorized the application of septage up to the limits permitted by the DNR. Wolkowski, in turn, testified that the amount of septage alleged to have been applied in excess of Fred's permission contributed less than one percent of the total nitrogen applied to the Preislers' farm between 2005 and 2008. In other words, Wolkowski testified that nearly all of the nitrogen applied to the Preislers' property was either applied by Fred himself or with Fred's consent. Wolkowski further testified that manure and commercial fertilizer have a higher nitrogen

content than septage, which tends to be "relatively low." Based on his calculations, Wolkowski testified that the application of septage on the Preislers' farm accounted for a "very small" component of the entire nitrogen application between 2005 and 2008. All of this testimony provided credible evidence for the jury to find that Fred was negligent in his farming practices.

¶77 This same testimony also supports the jury's finding that Fred's negligent farming practices were a cause of the Preislers' damages. Again, Dr. Wolkowski testified that the application of septage contributed a very small amount of nitrogen as compared to other sources of nitrogen, including Fred's application of manure and other fertilizers. The jury could therefore infer from Wolkowski's testimony that Fred's farming practices—at a minimum—were a substantial factor in causing the Preislers' damages. *See Ehlinger*, 155 Wis. 2d at 12. This evidence was further buttressed by the Preislers' own evidence showing the movement of ground water under their property and the effect of the nitrates on the Preislers' cattle. Thus, there was credible evidence to support the jury's finding that Fred's negligent farming practices were a cause of the Preislers' damages.

¶78 In sum, Fred had a duty of care to refrain from spreading manure and other fertilizers in a manner that a reasonable person, under the circumstances, would recognize as creating an unreasonable risk of injury or damage to a person or property. In addition, there was credible evidence to support the jury's finding that Fred was negligent in his farming practices and that Fred's negligent farming practices were a cause of the Preislers' damages.

¶79     No costs are awarded to any party.

        *By the Court.*—Judgment affirmed.

        This opinion will not be published.    *See* WIS. STAT. RULE 809.23(1)(b)5.